JOHN ZOLTON ADAM, JR. AND EDWARD YEATMAN
GREEN, JR. *v.* STATE OF MARYLAND

[No. 222, September Term, 1971.]

*Decided January 26, 1972.*

The cause was argued before MURPHY, C. J., and MOYLAN and GILBERT, JJ.

*Charles A. Norris* for appellants.

*John P. Stafford, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Joseph D. Weiner, State's Attorney for St. Mary's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, John Zolton Adam, Jr., and Edward Yeatman Green, Jr., were convicted in the Circuit Court for St. Mary's County by a jury, presided over by Judge Philip H. Dorsey, Jr., upon two separate indictments. Under the first, they were found guilty of breaking and entering a storehouse and stealing monies of the value of $5 and upward and also of attempting to burn the storehouse. Under the second, they were found guilty of malicious destruction of property.

Essentially three issues are raised on this appeal:

(1) Both appellants urge that the evidence was legally insufficient to sustain the convictions;

(2) The appellant Green contends that his right to be confronted with the witnesses against him, under *Bruton v. United States,* 391 U. S. 123, was violated when two witnesses testified as to certain incriminating remarks made by his co-defendant Adam; and

(3) Both appellants contend that the trial court abused

its discretion in permitting one Hilda Phelps to testify for the State as a rebuttal witness.

The State's case against the two appellants was overwhelming. Both crimes occurred within less than an hour of each other and within less than a block apart in Lexington Park at approximately 4 a.m. on April 28, 1970.

The Roost is a restaurant-bar which was secured for the night at approximately 1 a.m. on April 28. Shortly before 4 a.m., it was afire. By 4:30 a.m., engine companies had the fire under control. Charles H. Donaldson, a fire investigator for the State of Maryland, was able to determine that there had been two separate and distinct fires within the building, the centers of which were approximately 50 feet from each other and which could have been set as early as 3 a.m. One fire was in the immediate vicinity of two cash registers, the change trays of which had been removed and placed several feet away. That location was in the front of the building. The other fire had occurred in the dining room near a coffee maker and a refrigerator.

Francis Harris, the owner and operator of The Roost, testified that he discovered that a pinball machine, a helicopter machine and a jukebox had all been jimmied open and that somewhere in the neighborhood of $45 to $50 in change was missing. A door had been pried off of the jukebox. The front door of the pinball machine had been pried off and its coin box had been emptied of everything but one nickel. The helicopter machine had had its front door removed. Its money box was sitting beside the machine and there was a screwdriver stuck in it.

Mr. Harris further testified that one of the two doors in the rear of the building had been tampered with. Several spots in the frame of the door revealed that some type of instrument had been inserted to pry the door open. The iron grillwork over the door had been pulled out from the door and a wooden panel had been kicked in. The iron bar that went across the door had been

forced. The soil immediately surrounding both rear doors was heavily saturated with grease from the restaurant.

Mr. Harris further testified that the jukebox had contained between $5 and $6 worth of quarters that had been painted with a red nail polish. These were used when he himself or other employees had to place coins in the jukebox machine.

Approximately one block away from The Roost was Pat's Bar. Deputy Sheriff Ron Clarke testified that, after watching the fire at The Roost for about one-half hour, he and his wife went to Pearl's Restaurant at about 4:30 a.m. to get a cup of coffee. Pearl's Restaurant is located a few doors away from Pat's Bar.

State Trooper George W. Taylor had been dispatched to the scene of the fire in order to stop traffic. He was on duty in that capacity. He was stopping traffic on State Route 246 immediately in front of The Roost. Pat's Bar was one block away on Route 246. At about 4:45 a.m., he heard the sound of breaking glass and looked toward Pat's Bar. He saw both appellants standing in front of the large broken window. He began walking in that direction. The two appellants started walking across an adjacent Gulf Service Station. Trooper Taylor yelled for them to halt. They both began running. He gave chase. Initially, both appellants began circling around the Gulf Station and running down an alley between the Park Theater and Pearl's Restaurant. Trooper Taylor caught Green, but Adam got away. While this chase was in progress, Deputy Sheriff Clarke, who was having coffee with his wife inside Pearl's Restaurant, heard a heavy bang at the window. He turned and looked and saw Adam bouncing off the window and running away. He went to the door just in time to see Adam disappear from sight and to see Trooper Taylor apprehend Green.

Trooper Taylor and Deputy Sheriff Clarke took Green back to the front of Pat's Bar. They there noticed that Adam's car was parked in front of Pat's Bar, approximately 20 feet from where the window had been broken. Looking in the window, they observed a crowbar and a

screwdriver protruding from under the rear seat. They also saw a ball-peen hammer on the rear seat. Also on the driver's side of the rear seat was a piece of glass which appeared as if it had come from Pat's Bar. It had on it a Budweiser decal similar to the one which had been on the window of Pat's Bar. The piece of glass located on the rear seat also had a napkin running along the top edge of it. When Green was apprehended, Trooper Taylor took a screwdriver from Green's right hip pocket.

Patrick Caine, the owner of Pat's Bar, testified that the appellant Adam, when he was not away as a merchant seaman, worked at the bar, checking I.D. cards. He testified that Adam had worked there on the evening of April 27, 1970.

Immediately upon the apprehension of Green and just before the return of Green to the front of Pat's Bar by Trooper Taylor and Deputy Sheriff Clarke, Trooper Simms had arrived upon the scene and took up the chase of Adam. Deputy Sheriff Robert Stone testified that at about 4:45 a.m. he observed Trooper Simms running across an intersection toward the Lexington Park Hotel, which is located at the third apex of an equilateral triangle with Pat's Bar and The Roost as the other two corners. Deputy Sheriff Stone, knowing Adam, joined the chase. He soon spotted Adam at the rear of the Lexington Park Hotel. When Adam saw him, Adam began to run. Deputy Sheriff Stone called for Adam to stop but Adam ran up the stairs of the hotel and into room no. 75. Deputy Sheriff Stone noticed that Adam, as he was running, had a brown paper bag tucked under one arm. Stone knocked upon the door of room 75, which was opened by one Bruce Kraft. Kraft disavowed all knowledge of Adam's whereabouts. Stone then walked into the bathroom and apprehended Adam. As he was leading Adam away, he noticed the brown paper bag on the floor of the hallway near the entrance to room 75. He picked it up and discovered that it contained three sacks of money, which turned out to be $59.75 all in change.

Special Agent Charles E. Calfee, of the F.B.I., ex-

amined scrapings from the bottoms of the shoes of both appellants and found a greaselike substance similar in composition to that found in the soil at the rear of The Roost.

Agent Calfee found paint smears on the blade of one of the screwdrivers recovered from Adam's automobile which were similar in color and texture and type of paint to fragments taken from the piece of wood on the rear door of The Roost, where the door had been pried open. The small quantity found on the blade of the screwdriver precluded a more definitive compositional analysis.

Agent Calfee also did an analysis on some of the coins. He analyzed first the quarters recovered from The Roost which had been painted with the red nail polish. He found that two different types of polish had been used. In the sacks of change recovered from the hallway at the time of Adam's arrest were also recovered quarters marked with red nail polish. It was discovered that two different types of nail polish were involved. The two types found on the quarters recovered from the bag were identical with the two types found on the quarters in The Roost.

Adam testified in his own defense. He denied both offenses. He acknowledged, however, being at The Roost but explained that he arrived after the firemen and was there only to watch the fire. He acknowledged having walked around to the rear of the building, as an apparent explanation of how the grease got on his shoes. He acknowledged having had the screwdrivers, but explained that they had been obtained in order to make some repairs on his automobile. He acknowledged breaking the window at Pat's Bar, but explained that he and Green had just been "horsing around" and that the breaking had been an accident. The only explanation he could give for his precipitous flight from Trooper Taylor was that he "got scared." He denied having had a paper bag with him when he fled to his hotel room from Deputy Sheriff Stone. He explained rather that his roommate Bruce Kraft had been carrying the bag in the hallway

and dropped it when Adam bumped into him. In rebuttal, Deputy Sheriff Stone testified that Kraft had not been in the hallway during the chase.

The appellant Green testified in his defense. His testimony dovetailed with that of Adam, acknowledging being at the scene of the fire, having the screwdrivers, and breaking the window but offering the same explanations for each event.

This much of the evidence against both appellants was uncontested in terms of its admissibility. For either appellant to maintain that the evidence was legally insufficient to permit the trial judge to submit the case to the jury is frivolous.

Although not referring to *Bruton* by name, the appellant Green argues that he was prejudiced by two *Bruton*-type violations. The first instance, he argues, was when Renee Starling, a former girlfriend of Adam's, was called by the State in its case in chief. At the arraignment held some weeks before the trial, the appellant Green abandoned his effort to sever his trial from that of Adam when he ostensibly received an assurance from the State that no incriminating admissions would be used against Adam which could arguably implicate Green as well. The trial judge first heard the testimony of Renee Starling outside the presence of the jury and determined, rightfully we think, that nothing contained therein could adversely affect Green in any way. She was then permitted to testify in the presence of the jury. The sum total of that testimony consisted of three items which might be deemed to implicate Adam in some fashion. She testified that she saw Adam in the St. Mary's County Jail several days after his arrest and that he asked her to swear falsely that, on the night of the arrest, she had been with him and "Eddy and Eddy's girl and Eddy's mother" at Eddy's mother's restaurant. She also testified that, at one point in that conversation, she asked Adam, "Why he did it, and he just shrugged his shoulders and said, 'I don't know'." She also testified that on one occasion prior to April 28, she had heard Adam mention to one of his

friends that he knew where the money was kept at Pat's Bar. Whatever incriminating effect Renee Starling's testimony had was as to Adam alone. Green was not implicated or damaged in any way by the incriminating admissions which Adam made to Renee Starling. In this instance, *Bruton* is simply inapplicable.

The second instance involved the testimony of Hilda Phelps. She was called by the State as a rebuttal witness. She testified that on the evening of April 27, she had a brief conversation with Adam at the Gay Nineties Bar at between 10:30 and 11 p.m. The sum total of her significant testimony was:

> "He found out that Renee was going to go home with me that night. And he came to the table where I was sitting, and he said, 'Good, take Renee home with you because we are going to pull a job.'"

Although the appellant Green does not focus the argument in this regard in any helpful fashion, we would interpret his only peg on which to hang the claim of a *Bruton* violation to be the use of the plural pronoun "we." He might well argue that, because of all of the other evidence placing him in the company of Adam during the critical period of several hours following this alleged statement, the jury could not help but infer that when Adam said "we", he was referring to himself and Green. We will, therefore, consider Green's claim in this regard to have crossed *Bruton's* threshold at least.

This case is distinguishable from *Bruton,* however, because Adam, the alleged author of the arguably incriminating pronoun "we", took the stand in surrebuttal to testify as to the conversation. He did not deny the conversation as such, but characterized it in a fashion which would give it a far different meaning. He agreed with everything said by Hilda Phelps until she got to the words "We are going to pull a job." Adam testified that he at that point told Hilda Phelps that "Bruce was going to pull a job." He testified that he was referring

to his friend and part-time roommate at the Lexington Park Hotel, Bruce Kraft. He explained that Kraft had wanted him to go along on the job but that he had declined. He testified that he had agreed to let Kraft use his (Adam's) car for "the job."

Under the circumstances, we think (1) that the arguably incriminating use of the word "we" was so explained away in terms innocuous to Green that the *Bruton* threshold was recrossed to the non-incriminating side and (2) that, in any event, Green was not denied the right to a meaningful confrontation and cross-examination. *Bruton* applies only when the declarant of the incriminating statement is not available for meaningful cross-examination. We feel that this case is on all fours with *Lipscomb v. State,* 5 Md. App. 500, wherein Chief Judge Murphy said, at 506:

> "We think it clear from the above that the constitutional predicate underlying *Bruton* is the Sixth Amendment right of an accused to confront and cross-examine the witnesses against him. The present case is unlike *Bruton,* however, since here the confessing co-defendant, Dabney, did testify at the trial, and was cross-examined by the appellant, so that his Sixth Amendment right to confront and cross-examine Dabney was not violated."

We are not unmindful that the appellant Green might seek refuge from this limitation on the operation of *Bruton* in the rationale of our decision in *Sutton v. State,* 8 Md. App. 285, 295-298. In *Sutton,* we relied on *Douglas v. Alabama,* 380 U. S. 415, and on the Illinois decision of *Hammond v. State,* 6 Cr L 2072, filed October 8, 1969, which, in turn, also relied heavily on *Douglas.* Our holding was that even where a confessing co-defendant takes the stand, the effective right of cross-examination guaranteed by *Bruton* is denied if the co-defendant denies making the incriminating statement. Although it is unlikely that the circumstances at bar would have qualified

for the *Sutton* rationale, far more to the point is that whatever vitality *Sutton* may have had has been completely sapped by *Nelson v. O'Neil,* 29 L.Ed.2d 222. The Supreme Court in *Nelson* took the statement from *Douglas* which we had relied upon in *Sutton,* labeled it mere dictum, and then repudiated that dictum. In giving a more restricted reading to *Bruton* than had seemingly been theretofore indicated, *Nelson* held squarely:

> "We conclude that where a co-defendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments."

In the light of *Nelson,* we reconsider and reverse our holding in *Sutton.*

Even were our view otherwise, however, on the inapplicability of the *Bruton* doctrine as succor for the appellant Green, we would still deem any error here to be harmless beyond a reasonable doubt. *Harrington v. California,* 395 U. S. 250, made it clear that a *Bruton* error "can be harmless where the other evidence is overwhelming." *Sutton,* at 297; *Ham, Lee, Bailey and Cole v. State,* 7 Md. App. 474, 484-485; *Richardson and Thomas v. State,* 7 Md. App. 334, 341-343. In the case at bar, the evidence against Green was so overwhelming that we are convinced, beyond a reasonable doubt, that any conceivable impact of Adam's inculpatory use of the word "we" was so minimal and merely cumulative as to be nugatory.

The final contention, made by both appellants, is that the court abused its discretion in permitting Hilda Phelps to testify as a rebuttal witness. They place too narrow a meaning upon the concept of rebuttal. Adam took the stand in his own defense and, although acknowledging his presence at both crime scenes, protested his utter

lack of criminal intent. The admission made to Hilda Phelps some few hours earlier that he was "going on a job" belied that innocence. The testimony was proper rebuttal.

*Judgments affirmed; costs to be paid by appellants.*