MICHAEL LEON McCREE, ROBERT LAVERN DIXON
AND
JOHN JUNIOR GARRIS *v.* STATE OF MARYLAND

[No. 1381, September Term, 1975.]

*Decided September 21, 1976.*

The cause was argued before THOMPSON, MOYLAN and MENCHINE, JJ.

*Leslie L. Gladstone, Assigned Public Defender,* for appellant Michael Leon McCree. *Howard L. Cardin, Assigned Public Defender,* for appellant Robert Lavern Dixon. *Harold Buchman, Assigned Public Defender,* for appellant John Junior Garris.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Stephen Sacks, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, Michael Leon McCree, Robert Lavern Dixon and John Junior Garris, were tried jointly by a Baltimore City jury, presided over by Judge Basil A. Thomas, upon charges of murder and armed robbery. The appellants McCree and Dixon were convicted of murder in the first degree and armed robbery and were sentenced to consecutive terms of life imprisonment and ten years. The appellant Garris was convicted of second-degree murder and armed robbery and was sentenced to consecutive terms of thirty years and fifteen years.

All three appellants make the following contention upon appeal:

(1) That they were prejudicially denied their motions for a trial severance.

The appellants Dixon and Garris make the following joint contention:

(1) That the trial judge erroneously refused to permit them to question a State's witness concerning a prior but constitutionally invalid conviction.

The appellant Garris alone makes the following contention:

(1) That the evidence was not legally sufficient to have permitted the cases against him to go to the jury.

The appellant Dixon alone makes the following contention:

(1) That the trial judge erroneously refused to exclude the fruits of an unconstitutional search of and seizure from an automobile operated by him.

The appellant McCree alone makes the following contentions:

(1) That the trial judge erroneously refused to exclude the

fruits of a search of his belongings taken from the desk clerk of a New York hotel just subsequent to McCree's arrest;

(2) That the trial judge erroneously denied his Motion for Mistrial on the ground of an improper comment by the State's Attorney in closing argument to the jury;

(3) That the trial judge erroneously permitted the State's Attorney to ask leading questions to key State's witnesses; and

(4) That the trial judge erroneously refused to strike juror Jenny Malone for cause.

In order to set the stage factually for consideration of the severance contention and for consideration of the two distinct search and seizure contentions, we will set out the involved and at times circumstantial web of evidence linking in all three appellants. Since only the appellant Garris has questioned the legal sufficiency of the evidence against him, we will, for the sake of judicial economy, focus upon him and discuss the significance of the evidence against him as we recount the broader narrative. In the course thereof, we will, without pause, discuss the physical evidence as well as the testimony because Garris himself does not, upon appeal, question the constitutionality of the searches and seizures. The physical evidence would, therefore, be admissible against him, notwithstanding its fate in the cases against the other two appellants.

The evidence established unequivocally that all three appellants were homosexual, were female impersonators and were prostitutes. The same was true with respect to at least several of the witnesses in the case. Throughout the testimony, witnesses referred to any of the three appellants by the feminine pronouns "she" or "her" rather than by the masculine pronouns. The three appellants had, moreover, female names which were used more regularly in the testimony than were their male names. For sake of reference, we list them below:

Robert Dixon — Laverne, Sweet Thing or Cobra

Michael McCree — Lisa

John Garris — Theresa

The murder and robbery victim, Saul Charles Friedenberg, was a sexual client of Robert "Laverne" Dixon. The murder occurred at some time after 2 p.m. on July 8, 1974. Mr. Friedenberg left his home that morning for work. He was wearing a yellow-gold Bulova wristwatch and a sapphire ring and driving a 1973 yellow Cadillac. When he failed to return home by 6 p.m. that evening, his wife became apprehensive. On the following day, July 9, 1974, his wife filed a missing person's report. The murder occurred in the second-floor rear apartment of the appellant Robert "Laverne" Dixon at 1715 N. Calvert Street. The body was found three days later, on July 11, 1974, in a closet, the door to which had been nailed shut from the outside. A refrigerator had been pushed in front of the door. The body lay face down on the floor. A towel was draped over the back of the head. The ankles were bound. The hands were tied behind the back. His shirt and his jacket were missing. The zipper to his trousers was open. One shoe was found under his head and the other was lying in an otherwise empty closet. The watch and the sapphire ring were missing as were all of Mr. Friedenberg's credit cards. The yellow Cadillac was also missing. Mr. Friedenberg had been strangled with a length of insulated electric wire.

The evidence demonstrated beyond peradventure of a doubt that the appellants Dixon and McCree had participated in the murder and robbery. Indeed, they do not contest the legal sufficiency of the evidence against them. Our focus will be upon the case against the appellant Garris, who does contest the legal sufficiency of the evidence against him. In a jury trial, the test as to whether the evidence was sufficient in law to permit the trial judge properly to deny the appellant's motion for a judgment of acquittal and to submit the case to the jury is whether the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offense charged. *Williams v. State*, 5 Md. App. 450, 459; *Metz v. State*, 9 Md. App. 15, 23. We conclude that

the evidence against the appellant Garris was sufficient to permit the jury to be convinced of his guilt beyond a reasonable doubt.

Janice Alexander, an admitted prostitute, lived at 1707 N. Calvert Street, just four doors south of the residence of the appellant Dixon. She had known Dixon for over a year. She had visited his apartment and she knew him to be both a female impersonator and a prostitute. She was sitting on her front steps at approximately 2 p.m. on July 8, 1974, when she saw a yellow Cadillac drive up and stop in front of the appellant Dixon's apartment. She saw the appellant get out and enter his apartment. He was dressed in female clothing. She later identified photographs of the deceased as photographs of the white man who drove up in the Cadillac with Dixon. That man followed Dixon into the apartment approximately one minute later. She had noticed Dixon and Mr. Friedenberg converse for a few minutes before Dixon, later followed by Mr. Friedenberg, entered 1715 N. Calvert Street.

Shortly thereafter, Mrs. Alexander noticed the other two appellants, Michael McCree and John Garris, drive up in a red Maverick automobile. She was acquainted with both of them. She knew Garris only as "Theresa." The two had a baby with them. They parked in an alley. A brief conversation ensued between Mrs. Alexander and the two, in the course of which they declined to give her a ride to the 2000 block of N. Calvert Street. McCree, in the presence of John "Theresa" Garris, asked Mrs. Alexander where "Laverne" was. She replied that "Laverne" was "upstairs with a trick." She defined the word "trick" as connoting a man who pays for sexual pleasure. McCree, still in the presence of Garris, replied, "that must be the car," indicating the yellow Cadillac. McCree and Garris handed the baby temporarily to Mrs. Alexander, who kept it while McCree and Garris went back into the alley behind the rear of 1715 N. Calvert Street. They returned about ten minutes later. Mrs. Alexander testified that as McCree and Garris were standing in her presence, McCree said, "We should bust this man in the head and take his money and car." Mrs.

Alexander volunteered the observation that it was a stupid idea. The two men then left her presence and then went back in the alley behind 1715 N. Calvert Street. Mrs. Alexander left the neighborhood at that point. When she returned later that afternoon, she noticed that the Cadillac was gone. She learned from Robert "Laverne" Dixon's roommate that Dixon and the other two appellants had gone to New York.

Dwight Leroy Thomas testified that he had been living at 1715 N. Calvert Street for approximately two months prior to July 8, 1974, as the roommate of the appellant Dixon. Dixon actually rented the apartment but Thomas paid the rent. Dixon had no regular job but got money occasionally "from friends and people he met." Thomas acknowledged that Dixon sometimes brought men to the apartment. Dixon contributed what he could to the rent and the household expenses. Thomas testified that he and Dixon were lovers and that Dixon habitually dressed as a female.

Thomas worked at a restaurant in Pikesville throughout the day of July 8, 1974. He returned home at approximately 5 p.m. When he entered his apartment, he noticed broken glass on the floor. Later police investigation revealed that there were also bloodstains on both the floor and on a curtain dividing two rooms of the apartment. As Thomas began to pick up the broken glass from the floor, the appellant McCree walked into the room from the rear or kitchen area of the apartment. McCree indicated that he had broken a bottle and had cut himself in the course of picking it up. Thomas continued to pick up the broken glass. He then heard voices and walked to the bedroom part of the apartment where he found the appellant Dixon and the appellant Garris and a baby. Dixon was packing his clothes for a trip to New York. Shortly thereafter, Thomas went downstairs to bid the threesome goodbye. Both the yellow Cadillac and the red Maverick were parked together in the alley behind 1715 N. Calvert Street. Dixon and McCree drove off in the Cadillac and Garris followed in the red Maverick. Dixon indicated that they would be gone a couple of days.

Over the course of the next several days, Thomas began to detect a stronger and stronger odor in the apartment and

began to notice an ever-increasing accumulation of flies. On July 11, he moved the refrigerator from in front of the closet door and noticed that the door was nailed shut. He tried to pry it loose. He testified, "I just barely had it cracked and could see something in it. What, I didn't know." Thomas immediately called the police and informed them that "something was up in the closet, a body."

We notice at this point in the narrative that the appellant Garris, who was with the appellant McCree and the baby in the neighborhood of 1715 N. Calvert Street at approximately 2:30 p.m., is still with McCree and the baby (and now with the appellant Dixon as well) inside 1715 N. Calvert Street at 5 p.m. At the earlier time, Garris had been with McCree as McCree discussed "busting the man on the head and taking his money and car." Garris and McCree had then walked to the alley behind 1715 N. Calvert Street. In the meantime, the yellow Cadillac, which Garris realized belonged to Dixon's "trick," had been moved from the front street to the rear alley. The Cadillac was one of the two automobiles in which the combined party departed for New York. When Thomas returned home, Garris was with his two codefendants in the apartment. That apartment within the preceding two hours had been not simply the scene of the murder but also the scene of reasonably elaborate efforts first to bind the victim hand and foot and then to hide the dead body. The door had been nailed shut and the refrigerator had been moved in front of it, all by approximately 5 p.m. As subsequent recounting of testimony will reveal, Garris was, moreover, in possession of some of the effects of the deceased robbery and murder victim.

At some time during that afternoon, yet a fourth person, Bruce "Pepsie" Johns, had been approached at his home at 317 E. North Avenue by the appellant Dixon and informed that the whole group would shortly be leaving for New York and that Johns should come along. Johns was also a female impersonator and a prostitute. Dixon informed him, "We beat a trick and took his car." Johns was given about an hour to get packed and was to meet the others at 1715 N. Calvert

Street. By the time he got to the intersection of North Avenue and Guilford Avenue, however, he was met by his three companions, driving the two automobiles. Johns testified that before leaving Baltimore City, both automobiles drove to a pawnshop on Pennsylvania Avenue where Dixon and McCree went in and pawned the gold watch. During the subsequent ride to New York, the group stopped a number of times along the way and switched automobiles, with all three appellants taking a turn in each of the cars. At some point during the journey, Dixon repeated references to Johns about having beaten a trick and taking his car and then telling Johns, "Don't worry about it." Because of the constant switching of drivers, Johns could not testify with any certainty as to whether McCree or Garris were present at the time of such conversation. The whole group arrived in New York at approximately 11 p.m. They parked the automobiles and walked around for a time.

Later during the day of July 9, all three appellants and Johns and one Kim Wright, checked into and shared a single room at the Bond Hotel in Greenwich Village. Johns testified that he had known all of the appellants for a period of some years at least. While at the Bond Hotel, an argument broke out between the appellant Garris and the appellant McCree over the use of an Exxon credit card. McCree wanted to use it to get some gasoline. Garris insisted that they could not use it. Johns observed the Exxon card, as well as an American Express credit card, a Saks Fifth Avenue card and a Stratton Inn card. He observed that they bore the name "Friedenberg." The following evening, when the group had dinner at an Italian restaurant named Valentino's, Garris paid for the meal with Friedenberg's American Express credit card.

The next witness was Kim Wright, a New York resident, who had known Dixon well for some years. Kim Wright was also a female impersonator and prostitute. "Kim" met the group at approximately 5 a.m. on the morning following their arrival in New York. He recalled McCree telling him, "We killed a man and took his car." Although he did not ascertain precisely who was encompassed within the

pronoun "we," he stated that the appellant Garris was present at the time the statement was made to him by McCree. McCree elaborated that they had tied the man up and thrown him in a closet. "Kim" was present at the meal at Valentino's, where John "Theresa" Garris paid for the meal with the credit card. In reference to the use of the credit card, Garris assured "her" that "we weren't going to get busted."

On August 4, 1974, McCree was arrested in a New York hotel. Seized from him at that time was the pawn ticket for the victim's wristwatch. Three days later, on August 7, 1974, the appellant Dixon was arrested in Delaware, while driving the victim's yellow Cadillac. A motel key recovered from him led to further investigation which revealed that he was registered in a nearby motel under the name of S. C. Friedenberg. The appellant Garris was arrested in October, 1974.

With respect to the appellant Garris, we hold that the evidence was legally sufficient to have permitted the jury to find, beyond a reasonable doubt, that he did participate along with the codefendants, either as a principal in the first degree or as a principal in the second degree, in the robbery and in the murder of Mr. Friedenberg. His joint exclusive possession of recently stolen goods — both Cadillac and credit cards — permits the inference that he was the thief (or one of the thieves). The *corpus delicti* was such, moreover, as to establish that to be the thief is also to be the robber and murderer. Neither the appellant Garris nor either of the other appellants took the stand or offered any defense. There was, therefore, no reasonable and believable explanation offered of that incriminating possession. This possession alone would be legally sufficient evidence to sustain the convictions, but the recounting of all of the evidence of guilt reveals that there was massive other incriminating evidence.

All three of the appellants contend that they were erroneously denied trial severances from each other. The law

with respect to the granting of a severance is clear. As we stated in *Peterson v. State,* 15 Md. App. 478, at 496:

> "The decision as to whether to grant a severance lies within the sound discretion of the trial judge under Maryland Rule 735, and one of the factors to be considered is the saving of time and expense which unnecessary separate trials would entail. *Jennings v. State,* 8 Md. App. 312. The Assistant State's Attorney proffered and the evidence bore out such a strong probability of a common criminal effort by all defendants, including Logan, that the evidence admissible as to one would have been admissible as to all."

In this case, all three appellants were involved in a single incident. The evidence admissible against any one of them was in this case admissible as to all. There was no violation of the confrontation law under *Bruton v. United States,* 391 U. S. 123, because the State chose, as a deliberate tactic, not to offer extrajudicial statements given to the police by the appellants Dixon and McCree, in the course of which they admitted their presence at the scene although each denied his individual involvement. There was, under *Bruton,* no prejudice suffered at the trial. The strained theory now offered by the appellants that the mere existence of those extrajudicial statements, being held in reserve for impeachment purposes should either Dixon or McCree give contrary testimony under oath, somehow "chilled" their defense is speculative in the extreme. We know of no law pushing the *Bruton* principle that far and we decline to make such law.

In terms of the factors here reenforcing the sound exercise of discretion of the trial judge in denying the severance, we note that the following proffer was made by the prosecution:

> "One factor is in saving of time and expense for unnecessary, separate trials would in this particular matter treble the time, treble the expense. I can understand Mrs. Bothe's point to the right of the defendant and it is a fact the State has

brought in three witnesses from New York and two witnesses from Delaware. It may not be all the witnesses would arrive from out of State. They will be placed in hotels for the duration of the trial. The expenses are enormous for the duration of the trial, possibly two weeks."

We see no abuse of discretion. We feel here as we did in *Mason v. State*, 18 Md. App. 130, at 141:

"Under the circumstances of this case, where the evidence necessary to convict one of the appellants was the same evidence required to convict all of them, to have granted a severance would have resulted in a multitude of trials and unnecessary expense."

The appellants Garris and Dixon both contend that the trial judge erred in refusing to permit the State's witness Dwight Thomas to be cross-examined about a prior criminal conviction for purposes of impeaching his credibility. At the time of trial, Thomas was either 27 or 28 years of age. The conviction in question was for the crime of armed robbery. That conviction occurred in Baltimore City some 10 or 11 years earlier, when Thomas was either 16 or 17 years of age. In urging that the cross-examination not be permitted, the State argued that the complex of such cases as *Long v. Robinson*, 316 F. Supp. 22 (D. Md. 1970); *Kemplen v. Maryland*, 428 F. 2d 169 (4th Cir. 1970); and *Greene v. State*, 11 Md. App. 106 (1971), operated retroactively to remove the criminal stigma from proceedings involving defendants under the age of 18 who would (barring possible waiver) have been treated as juveniles in all areas of Maryland outside Baltimore City. In the exercise of his discretion, Judge Thomas elected to give the benefit of that philosophy to the witness Dwight Thomas. Recognizing that what is involved here is essentially peripheral, even more so when dealing with a mere witness and not a defendant himself, and that wide discretion is vested in the trial judge to

control the ebb and flow of testimony, we see no abuse of discretion here. *Davis v. Alaska,* 415 U. S. 308, urged upon us by the appellants, is not remotely apposite. That case, involving a juvenile proceeding then pending against a witness, was dealing with possible bias because of then-pending proceedings. The present case, involving an adjudicated conviction a full decade in the past, does not remotely call for the invocation of the principle of *Davis v. Alaska.* We see simply no abuse of discretion here.

We turn our attention now to the search and seizure question raised by the appellant Dixon. He objects to the search of the yellow Cadillac conducted by the Delaware police, when they stopped him and arrested him on August 7, 1974, near Dover, Delaware. He was handcuffed and placed in the back seat of a patrol car. Recovered from the Cadillac was his purse, which contained a key to a room at the Dutch Village Motel in Newcastle, Delaware. The tracing back of that key led to the fact that Dixon was registered at that motel in the name of the murder victim, S. C. Friedenberg.

The appellant urges strenuously upon us that his purse on the front seat of the Cadillac was beyond the permissible search perimeter under *Chimel v. California,* 395 U. S. 752. He may be perfectly correct in that contention but a "search incident to lawful arrest" is by no means the only exception to the warrant requirement which might serve to legitimate the warrantless search of the yellow Cadillac here. The police team knew that murder and robbery had been committed and that the yellow Cadillac itself was one of the fruits of the robbery. It was itself evidence, therefore, above and beyond being the container of other probable evidence — the stolen credit cards, possible bloodstains, fingerprints or other identifying links to the perpetrators of the crime. As it was stopped on U.S. Route 13 one mile east of Dover, there was furthermore exigency. Those two factors combine to legitimate warrantless automobile searches under the doctrine of *Carroll v. United States,* 267 U. S. 132.

The car, moreover, was stolen and the defendant Dixon had, therefore, no standing to object to its search. *Palmer v.*

*State,* 14 Md. App. 159. There was simply no legitimate expectation of privacy by a thief in the enjoyment of the stolen automobile.

The issue would go against the appellant Dixon for yet a third reason. Implicit in the complaint given to the police by the murder victim's widow, Mrs. Friedenberg, and by her description of the stolen property, was her full consent to the police to recover and to seize those items whenever and wherever they should track them down. There is no question but that the true owner of the automobile voluntarily consented to all police action taken with respect thereto. *Schneckloth v. Bustamonte,* 412 U. S. 218.

The remaining contentions were raised by the appellant McCree alone. In one of them, he objects to the warrantless search and seizure which occurred at the time of his arrest in New York. McCree was arrested at the Strand Hotel in New York City on August 1, 1974, by Detectives Furrie Cousins and George Kibbler of the Baltimore City Police Department, Assistant State's Attorney Michael Glushakow and three New York City police officers. He was arrested at gunpoint in his bedroom. As he was led downstairs, McCree indicated that he wanted his property from the night manager of the hotel, since he knew that he would not be returning to the hotel. The night manager turned over a bag. The detectives searched it. In that bag was the pawn ticket for Mr. Friedenberg's gold Bulova watch. The purpose of a warrantless search incident to lawful arrest is to prevent an arrestee from having available weapons either to harm the officers or to make good an escape and further to prevent the arrestee from destroying evidence. Although the bag held by the night manager might not have been literally within McCree's *Chimel* perimeter at the moment of his arrest upstairs, it clearly would have come into that "floating zone" of reachability, lungeability or graspability if it had been turned over to him by the night manager. As Judge Thomas found in ruling the evidence admissible:

> "It would seem to me under the circumstances of this case, the facts of this case, if someone is asking for an envelope and the envelope being handed in

the presence of police, the police have an obligation for two reasons, one to protect themselves in the event there is something in the envelope, whether it be a razor blade, small gun, or secondly, for the protection of the defendant. The defendant could very well put something in there, a razor blade, he might want to harm himself. In addition there could be contraband of some sort in there he would want to destroy. I don't care how we look at it, this would be a proper purpose of the police. The police have an obligation or a right to examine that envelope."

We concur in that judgment. See also *United States v. Edwards*, 415 U. S. 800. We note, moreover, that the pawn ticket was eminently destructible — by way of being swallowed, or being tossed away, or being torn into little pieces or being flushed down a toilet — had it been permitted to come into the unfettered control of the arrestee McCree.

McCree also claims that his Motion for a Mistrial was erroneously denied following improper comment by the State's Attorney in closing argument to the jury. The point is utterly without merit. At issue was the principle that a fact finder may, from the possession of recently stolen goods, infer that the possessor was the thief. In his instructions to the jury, the trial judge phrased this principle in terms of a permitted inference, as did the Assistant State's Attorney in his initial closing argument. The appellant McCree's entire contention deals with the fact that in rebuttal argument, the Assistant State's Attorney used the word "presume" instead of the word "infer." He relies upon our lesson in careful semantics in this regard in *Evans v. State*, 28 Md. App. 640. He fails to appreciate that we also pointed out in *Evans* that many lawyers use the word "presume" to mean "infer." Moreover, the appellant was free to argue any point of contested law as well as any point of contested semantics as freely as was the State. We do not examine argument of counsel in searching for possibly mistaken or confusing statements of law as we

examine the instructions given by a trial judge. Without further comment, the trial judge was absolutely correct in denying this frivolous Motion for a Mistrial. *A fortiori,* he did not abuse his discretion in doing so.

The appellant McCree's next-to-last contention is that the trial judge erroneously permitted the Assistant State's Attorney to ask leading questions of State's witnesses. The two leading questions here in issue were efforts by the State at the very outset of the testimony of Kim Wright and of Bruce Johns to direct the attention of the witnesses to the days of July 9 and July 8 respectively. We see absolutely no abuse of discretion in the trial judge in permitting the State so to focus the attention of the witnesses. *Johnson v. State,* 9 Md. App. 327, 332.

The appellant McCree's final contention is that the trial judge erroneously refused to strike a potential juror Jenny Malone for cause. During the *voir dire* examination, the following colloquy took place.

"(Jenny M. Malone entered chambers, at which time the following took place.)

MRS. MALONE: This morning when you called the name of the witnesses, you called Janie Alexander. I think that is her married name, her last name. She was in the hallway. She stopped me, she told me she was in the case. I told her I couldn't talk to her. I knew one of them.

THE COURT: Are you social friends? See each other?

MRS. MALONE: No, not for the last three years.

THE COURT: Would the fact she may be a witness in this case, you think that might in any way influence your judgment in the case?

MRS. MALONE: No.

THE COURT: It would not?

MRS. MALONE: No.

MR. GLADSTONE: Would you be more or less likely to believe her testimony than any other witness merely because you know her?

MRS. MALONE: I have to believe both sides. Would I believe her more than I would believe someone else?

MR. GLADSTONE: Yes.

MRS. MALONE: No.

MR. GLADSTONE: How well did you know her?

MRS. MALONE: We were friends in school but after I got out of school, I never saw her any more."

In the first place, we think the ruling of the judge in refusing to strike Mrs. Malone for cause was not in error. A juror may be struck for cause only where he or she displays a predisposition against innocence or guilt because of some bias extrinsic to the evidence to be presented. *Johnson v. State*, 9 Md. App. 143, 149. We note, moreover, that Mrs. Malone was struck peremptorily and did not sit upon the jury. The only arguable claim the appellant McCree could therefore make would be that he was required to use up unnecessarily one of his store of peremptory challenges. This could only be material if at the end of jury selection, he did not have unused challenges left over. The appellant McCree does not maintain that this was the case. At the appellate level, the burden is upon him to prove error, not upon the State to prove non-error. This burden he has failed to carry. Our examination of the record goes further and indicates, as we examine the lists of panel members who were called and the notations made on those lists by the clerk, that the appellant McCree used only 16 of his 20 peremptory challenges. Even if the initial ruling of the trial judge had been erroneous, therefore, the error would have been manifestly harmless.

*Judgments affirmed.*