ISAAC NEWTON JOHNSON AND CHARLES TERRELL
WALTERS v. STATE OF MARYLAND

[No. 263, September Term, 1977.]

*Decided December 13, 1977.*

The cause was argued before MORTON, MASON and WILNER, JJ.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Gilbert Rosenthal, Assistant Attorney General, John S. Hollyday, State's Attorney for Washington County,* and *Darrow Glaser, Assistant State's Attorney for Washington County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Appellants, Isaac Newton Johnson and Charles Terrell Walters, were convicted by a jury in the Circuit Court for

Garrett County (Thayer, J., presiding) of murder in the first degree (felony murder), attempted robbery with a deadly weapon, assault and use of a handgun in the commission of a felony. Both were sentenced to life imprisonment for the murder convictions and consecutive five year terms for the handgun convictions. Additionally, terms of ten and five years, respectively, were imposed on each appellant for the attempted robbery and assault convictions, to run concurrently with the life sentence.

Appellants contend in this appeal that the trial court erred (1) in denying their motions for separate trials and (2) in admitting extra-judicial statements uttered by Walters which implicated Johnson in these crimes in violation of the rule against the admission of hearsay evidence and the confrontation clause of the sixth amendment; that (3) appellants' simultaneous convictions for felony murder and the underlying felony violate the fifth amendment prohibition against double jeopardy and (4) appellants' convictions for assault should merge into their convictions for attempted robbery with a deadly weapon.

The record reveals that on March 15, 1975, at approximately 8:25 p.m., Ralph Charles Hull was shot and killed while in the grocery store which he operated in Hagerstown, Maryland. During the course of a four day trial, the State elicited the following testimony.

Claudus Barger, who was peripherally connected to the offense, testified that several days prior to the crimes he and several friends, including appellants, drove past the victim's store. According to Barger, one of his passengers "said something about it would be an easy place to knock off or something." Although not certain, Barger thought that Walters had made the remark. Barger also testified, over objection, that between 5 and 5:30 p.m. on the evening of the crimes Walters told him that "he was going to pick up Ike and make some money."

It was further revealed that Barger, upon learning that appellants had been arrested, removed a .38 caliber pistol and holster from Walters' car. Barger removed three live shells and one spent shell from the gun and flushed the shells down

the toilet. The gun was eventually recovered by the Hagerstown Police Department.

Lieutenant Paul Mentzer testified that the .38 caliber bullet removed from the victim's body was discharged from a gun similar to the one that Barger had found in Walters' car, although the bullet was too mutilated to be positively identified. There was also testimony that Walters was carrying a .32 caliber revolver when he was arrested.

The State produced two witnesses, Stephen Hull and Donald Pitznogle, who identified Johnson at a lineup as being one of the participants in the robbery. Although unable to identify either appellant at the lineup, the father of Donald Pitznogle testified that he saw Johnson flee from the victim's store carrying a gun, shortly after he had heard a shot emanating from within the store.

John Kahl-Winter, when called to the witness stand by the State, testified that he had approached Walters earlier on the day of the shooting and asked him to repay a prior loan. Walters instructed Kahl-Winter to meet him at the Hat Tavern that evening as he "would be picking up a check at 8:00 p.m." At the tavern Walters showed Kahl-Winter a .32 caliber revolver and told him that "this is what I've been doing." Walters also told him that he had just finished "pulling a job" in Damascus for $400 and that he had "pulled a couple" others around town. Later that evening, after Walters had returned to the Hat Tavern, Kahl-Winter once again approached Walters for the money. Walters retorted that "[i]t didn't go down right, we had to shoot the man."

The final witness called by the State was Margaret Shawyer, Johnson's girlfriend. She testified that Johnson called her on the evening of March 15, 1975, at approximately 8:35 p.m. and "sounded nervous and his voice was quivering." Johnson mentioned something to her about a "fight," although he was vague over the telephone about details. Johnson informed Shawyer that he would "have to leave town for three or four days" and wanted her to come with him. Although she told him that she would be unable to leave Hagerstown, she did comply with his request to pick him up in a taxi. She further testified that during the course of the

telephone conversation Johnson had exhibited anxiety about the police. Upon rendezvousing with appellants at the Hat Tavern, Shawyer stated that Walters rhetorically asked, "Why does everybody have to be a hero?"; and that Johnson inquired of her how she would feel "if . . . [he] had shot and killed somebody?"

In his defense Walters presented several alibi witnesses and attempted to discredit Shawyer's testimony. Johnson did not put forth a defense.

Appellants first contend that the trial court [1] erred in denying their motions for separate trials pursuant to Maryland Rule 735, [2] which reads:

"If it appears that an accused or the State will be prejudiced by a joinder of offenses or of defendants in an indictment, or by joinder for trial together, the court may order an election or separate trial of counts, grant separate trials of defendants · or provide such other relief justice requires."

The propriety of the trial court's refusal to grant a severance is measured by the standards we recently articulated in *McCree v. State,* 33 Md. App. 82, 92-93, (1976), where we said:

"As we stated in *Peterson v. State,* 15 Md. App. 478, at 496:

'The decision as to whether to grant a severance lies within the sound discretion of the trial judge under Maryland Rule 735, and one of the factors to be considered is the saving of time and expense which unnecessary separate trials would entail. *Jennings v. State,* 8 Md. App. 312. The Assistant State's Attorney proffered and the evidence bore out such a strong probability of a common criminal effort by

1. A hearing was held on Walters' motion for severance on October 20, 1976, before Judge Stuart F. Hamill. Johnson's motion was heard immediately prior to trial on February 22, 1977, by Judge Fred A. Thayer.
2. Rules 734 and 735 were consolidated into Rule 745, effective July 1, 1977.

all defendants, including Logan, that the evidence admissible as to one would have been admissible as to all.'

\* \* \*

"We see no abuse of discretion. We feel here as we did in *Mason v. State,* 18 Md. App. 130, at 141:

'Under the circumstances of this case, where the evidence necessary to convict one of the appellants was the same evidence required to convict all of them, to have granted a severance would have resulted in a multitude of trials and unnecessary expense.' "

As in *McCree* and *Mason,* most, if not all, of the evidence admitted below would have been admissible in each trial if Johnson and Walters had been separately tried. We do not feel that the trial court abused its discretion in refusing to grant a severance in light of the length of the trial — four days — and the concomitant expense thereof. *McKnight v. State,* 280 Md. 604 (1977).

*McCree* notwithstanding, Johnson argues that the trial court erred in refusing to grant a severance because it was apprised of possible issues arising under *Bruton v. United States,* 391 U. S. 123 (1968), which, Johnson feels, mandated the granting of his request for a separate trial.[3]

In *Bruton,* the petitioner was convicted partially on the basis of a confession given to a law enforcement official by Evans, Bruton's co-defendant, which not only incriminated the confessor but also incriminated Bruton. Since Evans asserted his fifth amendment right not to testify, Bruton argued that the admission of Evans' confession violated his right under the sixth amendment to confront all witnesses against him because he was denied an opportunity to cross

---

3. Appellants refer specifically to Walters' statement to Barger on the evening of the crimes that "he was going to pick up Ike and make some money" and to Kahl-Winter's testimony that Walters related to him at the Hat Tavern at 9:45 p.m. on the evening of the crimes that "[i]t didn't go down right, we had to shoot the man." It is patent that the use of "we" referred to Johnson and Walters (Adam and Green v. State, 14 Md. App. 135, 142 (1972)) and that "Ike" was appellant Isaac Newton Johnson.

examine Evans on the witness stand. *See Pointer v. Texas,* 380 U. S. 400 (1965). In reversing Bruton's conviction Justice Brennan, speaking for the Court, stated:

> "This case presents the question, last considered in *Delli Paoli v. United States,* 352 U. S. 232,whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a co-defendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence.

> \* \* \*

> "[T]he court [below], relying upon Delli Paoli, affirmed petitioner's conviction because the trial judge instructed the jury that although Evans' confession was competent evidence against Evans it was inadmissible hearsay against peititoner and therefore had to be disregarded in determining petitioner's guilt or innocence.... We have concluded, however, that *Delli Paoli* should be overruled. We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. We therefore overrule *Delli Paoli* and reverse." 391 U. S. at 123-26.

*Bruton* thus stands for the proposition that the introduction of a co-defendant's confession to a law enforcement official, which also inculpates his co-defendant, violates the non-confessing defendant's right to confront all witnesses against him and that said violation cannot be cured by an admonition to the jury not to consider the confession against the non-confessing defendant.

The State, in this appeal, adopts the argument advanced by the state's attorney below that "he did not believe *Bruton*

would apply in the instant case because he believed *Bruton* to apply:

'... only to extra judicial admissions made to law enforcement officers where there are two or more defendants, and we have them. These two men were never interrogated. The police didn't even try to take a statement from them. So, I submit to you there is no *Bruton* problem ... and if they [statements] would be improper under *Bruton,* the court wouldn't permit them. If I thought they were improper, I wouldn't offer them. But we don't even have them, we have no testimony or statements which come under the *Bruton* rule ....' "

We do not here reach the soundness of the State's position since, as we shall discuss below, even if the failure to grant a severance in light of alleged *Bruton* problems was erroneous, such error, in the context of this case, would be harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638 (1976).

We agree with appellants' contention that the out-of-court statements by Walters and Kahl-Winter [4] were pure hearsay and erroneously allowed into evidence against Johnson [5] in violation of the rule prohibiting the admission of hearsay statements. "Hearsay evidence has been defined as 'testimony in court of a statement made out of court, the statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' " *Mutyambizi v. State,* 33 Md. App. 55, 65 (1976), quoting McCormick, Evidence 584 (2d Ed. 1972). Thus, there can be no question that the testimony Johnson complains of was hearsay evidence.

We think it equally clear that it does not fall within any of the established exceptions to the hearsay rule. It is true that

4. See n. 2, *supra.*
5. Clearly, the statements were admissible against Walters as an admission against penal interest. Smith v. Branscome, 251 Md. 582 (1968); Harris v. State, 27 Md. App. 547 (1975).

"the modern cases and text leave no room to doubt the statement that the accepted principle today is that evidence of declarations of a plan, design or intention presently entertained by the declarant is ... admissible when offered as evidence that the design was carried out by acts or omissions of the declarant." *Md. Paper Products Co. v. Judson,* 215 Md. 577, 591 (1958). *See also Bartell v. Bartell,* 28 Md. App. 180 (1975), *rev'd on other grounds,* 278 Md. 12 (1976).

The availability of this exception to the hearsay rule is, however, subject to the following caveat when Walters' out-of-court comments are offered into evidence against Johnson:

> "A further related problem is raised when the declarant's statements tend to prove cooperative actions on the part of others. If those cooperative actions themselves are at issue, there is a significant danger that the jury will use the declarant's statements as proof not only of the declarant's actions but also of the cooperative actions by a third person. In effect, the declarant's statement will be taken as proof of the other person's intent and as proof that this intent was carried out. For example, in the homicide prosecution of Frank, a witness testifies that on the morning of the killing the victim said, 'I am going out with Frank tonight.' While this tends to prove the victim's acts, it also tends to prove that Frank went out with the victim, a fact very much in issue. Despite the danger that juries will be neither willing nor able to make the distinction, courts have tended to admit the statements in these cases with limiting instructions directing the jury to consider them only on the issue of the declarant's actions." *McCormick, supra* at 699.

Since the trial judge did not instruct the jury that Walters' inculpatory out-of-court statements were not to be considered in assessing Johnson's culpability, their admissibility is not permitted under the plan, design or intention exception to the hearsay rule.

In *Mutyambizi v. State, supra* at 66, Judge Liss, speaking for this Court, set forth with approval the following statement from 2 Wharton, Criminal Evidence, § 272, at 21 (13th ed. 1972):

> "Where hearsay evidence has been improperly admitted over the objection of the adverse party, the error will require a reversal if the evidence relates to a material issue or is prejudicial to such adverse party. If the hearsay evidence is neither material nor prejudicial, the error will be ignored, provided that the conviction is amply supported by other competent evidence. Thus, the admission of hearsay evidence will not constitute reversible error where it is merely cumulative."

*See also Johnson v. State,* 23 Md. App. 131, 136 (1974).

Whether the admission of Walters' out-of-court statements was a violation of *Bruton,* which we do not decide, or simply a violation of the hearsay rule, our review of the record convinces us that the introduction of the hearsay testimony was harmless "beyond a reasonable doubt, [and] that the error in no way influenced the verdict" rendered against Johnson. *Dorsey v. State, supra* at 659. Johnson's girlfriend, Margaret Shawyer, testified that she spoke to Johnson over the telephone shortly after the murder had occurred at which time he "sounded nervous" and exhibited anxiety about the presence of the police; that he mentioned something about a "fight" and indicated that he had to leave town for a few days. More importantly, Shawyer testified to Walters' rhetorical statement, "Why does everybody have to be a hero?," as well as Johnson's fatal query: "How would you feel if I had shot and killed somebody?" If any doubts remained as to Johnson's involvement in these offenses, they were dissolved, in our view, by the eyewitness testimony of Stephen Hull, the younger Donald Pitznogle and the elder Donald Pitznogle that they had observed Johnson wielding a gun while participating in the robbery.

We agree with appellants' next contention that the simultaneous convictions and sentences for felony murder

and the underlying felony (attempted robbery with a deadly weapon) violate the fifth amendment prohibition against being twice placed in jeopardy. *Newton v. State,* 280 Md. 260 (1977). Accordingly, we reverse appellants' convictions for attempted robbery with a deadly weapon.

Appellants lastly contend that the convictions for assault merge into their convictions for attempted robbery with a deadly weapon. As this contention was not raised in the court below, it may not be made for the first time here. Maryland Rule 1085; *Colbert v. State,* 18 Md. App. 632 (1973).

> *Judgments of first degree murder, assault and use of a handgun in the commission of a felony, affirmed; judgments of attempted robbery with a deadly weapon, reversed; appellants to pay one-half the costs; one-half the costs to be paid by Washington County.*