920 A.2d 572

Diane M. FIGGINS

v.

William Andrew COCHRANE, Personal Representative
of the Estate of Robert James Cochrane, Jr.

No. 0636, Sept. Term, 2006.

Court of Special Appeals of Maryland.

April 6, 2007.

2

William T. Wood, Rockville, MD, for Appellant.

Walter W. Green, (Carlton M. Green, on the brief), College Park, MD, for Appellee.

PANEL: ADKINS, MEREDITH and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, J.

The appellant, Diane Marie Figgins, takes this appeal from the decision of Judge G. Edward Dwyer, Jr., in the Circuit Court for Frederick County 1) to impose a constructive trust upon what had been her late Father's family home in Ijamsville, Maryland and 2) to order the appellant, as constructive trustee, or some successor trustee to convey the property to the Personal Representative of the Father's estate.

Robert James Cochrane, Jr. (the "Father") died on November 10, 2004, at 72 years of age. His total probate estate was valued at $740,103.55. $630,000.00 of that value was in his family residence, which was the Father's only real property. At the time of his death, the Father had four adult children: 1) Robert James Cochrane, III, 54 years of age; 2) William Andrew Cochrane, who was appointed as the Personal Representative of his Father's estate and who is the appellee in this case, 50 years of age; 3) Donna Lynn Giarth, 48 years of age; and 4) the appellant, 45 years of age.

On May 26, 2004, five and one-half months before his death, the Father had executed a Power of Attorney which named the appellant as his attorney-in-fact. The Father had executed his Last Will and Testament on November 21, 2001. He added a Codicil to that Last Will and Testament on September 16, 2004, just two months before his death. On November 8, 2004, two days before her Father's death, the appellant, utilizing the Power of Attorney, conveyed the family residence from her Father to herself, individually, for no consideration.

On February 14, 2005, the appellee, in his capacity as Personal Representative of the Estate, filed a Complaint, in which he requested that a constructive trust be imposed on

the real property. Following a three-day trial that concluded on April 6, 2006, Judge Dwyer ruled that a constructive trust would be imposed and that a trustee would be appointed to convey the property to the appellee. In this appeal from that decision, the appellant raises several questions, which we have recast as follows:

1. Did Judge Dwyer erroneously rule that the existence of a confidential relationship between the appellant and her Father shifted to her the burden of establishing by clear and convincing evidence that there was no abuse of confidence and that the conveyance of the property was valid?

2. Did Judge Dwyer erroneously rule that the exercise of the Power of Attorney violated the gift provision of the Power of Attorney? and

3. Did Judge Dwyer erroneously refuse to admit the testimony of the late Father's lawyer pursuant to Maryland Rule 5–803(b)(3), the so-called state of mind exception to the Rule Against Hearsay?

### The Appellant As Primary Caregiver

Except for a period of two or three years, the appellant lived with her parents all of her life. That was true even after she married and even after she and her husband had two daughters and ultimately a granddaughter. The entire household moved into the Ijamsville residence in 1998, at the time of the Father's retirement. After redoing what had been an unfinished basement, the appellant and her husband lived in what amounted to an independent apartment in the basement. Their daughters and granddaughter lived on the second floor. The Father, who was confined to a wheelchair, and the mother lived on the ground floor. The Father had been operated on for lung cancer in 2000 and was wheelchair-bound after that. The mother assumed primary responsibility for his care until her own health began to deteriorate badly in the Spring of 2004. The mother died of cancer on August 29, 2004.

In the Spring of 2004, the appellant assumed the responsibility for the care of both of her parents. Until her Father's

death on November 10, 2004, she took care of him and the house, fed him and took him out for lunches and rides, administered his medicines, did the laundry, and, after he began receiving hospice help at home, worked closely with his nurses. She took her Father to his doctors' appointments and to church every day. She met with her Father on a daily basis to review the mail and to pay the incoming bills. At the time of her Father's death, therefore, the appellant had been his primary caregiver for approximately seven months.

### The Codicil of September 16, 2004

The Father and the mother had had, since 1996, reciprocal wills in which each left the bulk of his or her estate to the other. He executed a subsequent Last Will and Testament on November 12, 2001. Her ultimate Last Will and Testament was executed on May 13, 2004. Following his wife's death on August 29, 2004, the Father, on September 16, 2004, executed a Codicil to his Last Will and Testament, in which he replaced what had been Item 6, dealing with his specific bequests.

The Codicil's new Item 6 recognized the appellant's unique connection with the family residence.

I hereby give any household furniture, including any dining room, living room or family room furniture to Diane Marie Figgins.

The Codicil then recognized the financial contribution that the appellant and her husband had made to the improvement of the family residence over the years.

I hereby direct that my personal representative hire a certified appraiser to determine the value added to my residence by the improvements made in the basement. An *amount equal to the value added to my residence by the improvements made in the basement shall be paid to Diane Marie Figgins.* The appraisal must be done with[in] 90 days from my death.

(Emphasis supplied).

The Codicil again recognized the appellant's unique connection with the family residence by giving her 1) the exclusive

right of occupancy for three years and 2) the exclusive right to purchase the property for 120 days after the expiration of that three-year right of occupancy.

*I hereby* bequeath and *give the exclusive right to occupy* any real property owned by me at the time of my death *to Diane Marie Figgins for a period of three (3) years.*

. . . .

*I hereby* bequeath and *give Diane Marie Figgins the exclusive right to purchase any real property owned by me* at the time of my death at any time *until a period of not less than 120 days after any exclusive right to occupy expires* for the fair market value of the property.

(Emphasis supplied).

Once those special provisions had been made for the appellant, however, the rest and residue of the estate was given to all four of the children in equal shares.

*I hereby bequeath and give,* subject to the right to purchase my real property set forth below, *the rest and residue of my estate to my children,* Robert James Cochrane, III, William Andrew Cochrane, Donna Lynne Giarth and Diane Marie Figgins *in as equal shares as may be possible.* If any of my children, other than Robert James Cochrane, III, do not survive me, then that child's share shall be divided among his or her surviving issue. If that child does not have surviving issue the gift will be divided between that child's surviving siblings. If Robert James Cochrane III does not survive me, then his share shall be divided by his surviving siblings. If there is any dispute as to any division of property, the dispute shall be resolved in the sole and absolute discretion of my personal representative.

(Emphasis supplied).

### The Meeting of October 26, 2004

On October 26, 2004, the appellant and her Father had an appointment with the Father's attorney, Scott C. Borison, Esq. It was Mr. Borison who testified as to that meeting. The

testimony is very sketchy and vague as to precisely what was said and done in the course of that meeting. It is, however, that meeting on which the appellant relies for the heart of her defense against the claim of the Personal Representative.

When, on the earlier occasion of September 16, 2004, the Father had met with Mr. Borison in order to execute the Codicil to his Last Will and Testament, the Father asked what the tax implications might be if he refinanced his house in order to make a gift to the appellant. There was no further testimony as to what Mr. Borison's answer, if any, was to that inquiry. There was no mention, moreover, of in what amount such a gift to the appellant might have been. This brief testimonial snippet would suggest that the Father, as of September 16, was at least curious about the possibility of an equity loan and a gift but expressed no firm intention in that regard.

*[H]e asked questions about* if he refinanced and made a gift to Diane *what the tax implications would be.*

Q. Did he specify anything else about the gift? *Did he say what type of gift he was going to make* to them?

A. *It was my understanding he was going to take the equity out of the house and give her a gift.*

(Emphasis supplied).

On October 26, six weeks after the execution of the Codicil, the appellant and her Father returned to Mr. Borison's office. "He was in a wheelchair at that point, and I think she pushed him into the room." Although, on hearsay grounds, Mr. Borison was not permitted to testify as to the Father's expressed intentions, the following proffer was made by appellant's counsel.

The proffer is that Mr. Borison will say that Mr. Cochrane indicated that the loan didn't go through and that he wanted to transfer the property instead directly to his daughter.

In any event, Mr. Borison prepared a deed conveying the Father's residence from the Father to the appellant. It was not done that day because Mr. Borison needed a copy of the former deed to the property. Although on the earlier occasion

of September 16, 2004, Mr. Borison had been able to prepare the Codicil while the Father was in his office, he and the Father did not discuss changing the Codicil at the meeting of October 26, 2004.

Q In your October meeting with Mr. Cochrane, *did you discuss redoing his September 2004 codicil?*

A *No.*

Q *Did you discuss redoing his prior will?*

A *No.*

Q. Did you discuss any terms of the codicil in that October 2004 meeting?

A Not that I specifically recall.

(Emphasis supplied).

November 8, 2004 was agreed upon as the date on which the Father would return to Mr. Borison's office and execute the deed, were he so inclined.

### The Deed of November 8, 2004

That November 8 appointment was never kept. The Father had been under hospice care from October 14, 2004 until his death. He was on oxygen on a daily basis. As of November 3, he did not even know his son, the appellee. On that day he lapsed into a coma from which he never recovered.

On the day of November 8, the appellee was present with the appellant at their Father's bedside. The appellee described how the appellant took a break from the bedside vigil because "she needed to do a hardcore grocery shopping." It was in the course of that break that she went to Mr. Borison's office and, utilizing the Power of Attorney, signed the deed conveying the house to herself. The appellant, as soon as the deed was signed and notarized, went immediately to the Record Office and had it recorded. She never mentioned to her brother that she had taken either of these actions.

The appellee only learned about the deed when the appellant mailed him a copy of it sometime in late December. When he, in February, asked the appellant why she had

signed the deed of the house to herself, her reply was that she "deserved it." When pressed to "do what was right" by her parents' wishes, the appellant replied, "We will let a judge settle this."

### Two Distinct Appellate Hurdles

A judge, of course, did "settle this," and it is that decision of the judge now under appellate review. Although presented to us in an almost inextricably intertwined fashion, there are actually two very distinct legal issues that we must address. The appellant has two hurdles to overcome, the failure to clear either of which will be disqualifying. There is the Power of Attorney issue and there is the confidential relationship issue. They may overlap at times, but they are not the same.

The Personal Representative seeks to have a constructive trust imposed on his late Father's real property to the end that it be transferred back to the Father's estate. The appellant opposes that proposed course of action on the ground that the deed of November 8, 2004, transferring the property from her Father to herself was valid.

In examining the validity of the deed, we must first identify the grantor and then ask whether that grantor had the authority to make the deed. In this case, of course, the grantor was not the Father. He was in a coma from which he would never recover. The grantor was the appellant, acting ostensibly on her Father's behalf under her Power of Attorney from him. The stark reality which the appellant cannot ignore is that she herself, and not her Father, was the grantor.

The legal question, therefore, becomes that of whether the appellant, given both the authority and the limitations on that authority imposed by the Power of Attorney, acted properly in signing that deed on that occasion under those circumstances. That issue is not necessarily dependent on what the hypothetical desire of the Father might have been at that particular moment. An exercise of an ostensible Power of Attorney could be *ultra vires,* even if, coincidentally, it happened to be in full compliance with the wishes of the person who had

conferred the Power of Attorney. Conversely, an exercise of a Power of Attorney, in the best interest of a person granting it, could be completely valid, even if, coincidentally, it was against the immediate wishes of the person who had granted the Power. The two considerations are not identical.

The appellant nonetheless attempts to slide almost imperceptibly from the first consideration into the second as if they were indistinguishable. She wants to have the deed evaluated as if it were her Father's action and not her own. She actually disclaims having acted pursuant to the Power of Attorney, notwithstanding the fact that her signature on the deed expressly indicated that she was acting in that capacity. In her testimony at trial, the appellant denied ever having read the Power of Attorney. She professed no knowledge of her duties or responsibilities under that authority. Indeed, Judge Dwyer made a specific finding of fact in this regard.

Now Mrs. Figgins testified, as I recall, certainly *never up to the exercise of the power of attorney did she read the power of attorney.* I believe she's testified *she still hasn't read it.* So basically *she never really got to reading the power of attorney.* But *certainly she hadn't read it up to the time that she signed the deed and I find that.*

(Emphasis supplied).

In her appellate brief, the appellant affirmatively disclaimed ever exercising any discretion under her Power of Attorney. She rather claimed that she was nothing more than a non-thinking amanuensis who was simply randomly present to lift the pen, as she might just as readily have been even if no Power of Attorney had ever existed or if she had simply been the lawyer's secretary. In her brief, the appellant even professes to have signed the deed not at her Father's request, but at Mr. Borison's request because "his client Mr. Cochrane could not do so himself."

Under the appellant's analysis, the Power of Attorney would actually become irrelevant. The appellant seeks to have the deed of November 8, 2004, evaluated as if the Father himself had been the actual literal grantor and as if the appellant had

simply helped him lift his pen. The legal issue of the scope of the appellant's authority under the Power of Attorney, however, cannot be so adroitly finessed. The Father was not the grantor on the deed. The Father (whatever his intentions a week or two beforehand might arguably have been) did not on November 8, 2004, execute the deed of his property to the appellant. The appellant herself made that decision and took that action, ostensibly under the authority of the Power of Attorney. We will, therefore, address the question of whether the Power of Attorney actually conferred such authority upon her.

The existence of a confidential relationship between the appellant and her Father, along with the legal consequences of such a relationship, is both a distinct additional issue and a critical issue. Even if, *arguendo*, the appellant, in signing the deed, had been doing nothing more than carrying out her Father's wishes and even if, *arguendo*, the Power of Attorney had authorized her to do just that, there is still the unavoidable issue of whether the Father was at that time under the controlling influence of the confidential relationship.

The Father's wishes at that critical juncture, after all, may themselves have been nothing more than the forbidden fruit of a confidential relationship. The invalidating effect of a confidential relationship would be precisely the same even if the Father had been conscious on November 8, 2004, and had signed the deed himself. The effect of a confidential relationship in this case would be the same regardless of whether a Power of Attorney had existed or not. It would be the same regardless of whether the appellant had signed the deed or the Father had signed the deed for himself. It is, in and of itself, a dispositive issue.

### The Confidential Relationship Analysis

■ We shall first address the issue of a confidential relationship. The introductory paragraphs of the Power of Attorney expressly assert that "all powers ... will be exercised only in a fiduciary capacity." At the trial before Judge Dwyer, counsel for the appellant conceded that his client had

been in a confidential relationship with her Father in the months immediately preceding his death. Although appellant's trial counsel was not appellant's appellate counsel, the appellant's brief acknowledges, albeit somewhat grudgingly, that a confidential relationship did, indeed, exist.

> *Counsel for the Appellant appeared to concede* during closing arguments *that there was a confidential relationship* between the Decedent and Diane Figgins....

> ... *It does not appear to be contested that Diane Figgins and Mr. Cochrane,* her father, *had a confidential relationship.* A careful reading of Appellant's closing arguments fails to reveal an outright stipulation that there was a confidential relationship, but *it was not argued by Appellant's counsel that there was no confidential relationship and his arguments appear to be based on the assumption that there was a confidential relationship.*

(Emphasis supplied).

Accordingly, Judge Dwyer found, as a mixed matter of fact and law, that there was such a confidential relationship and that it shifted the burden to the appellant to show that the transfer of real property was valid.

> I will also determine that there's been conceded that *there is a confidential relationship* with Mrs. Figgins and with Mr. Cochrane, and *therefore the burden shifts to her to show the reasonableness of a transfer for, basically, no value.* [T]hat burden shifts to her by clear and convincing evidence and *she has to show the validity of that transfer and in no manner has she met that burden.*

(Emphasis supplied).

In *Mattingly v. Mattingly,* 92 Md.App. 248, 263, 607 A.2d 575 (1992), Judge Motz wrote for this Court in describing the very heavy burden cast upon the dominant party in a confidential relationship to overcome the presumptive invalidity of an ostensibly voluntary transaction.

> In a suit in equity, *if a plaintiff establishes the existence of a confidential relationship, the burden shifts to the defendant* to establish that the plaintiff's actions were "free,

voluntary and unbiased." Thus, *when* a confidential relationship is established, and *"the party occupying the position of dominion," "receives a benefit"* from the transaction, *there is a presumption against its validity, placing upon the beneficiary the burden of establishing by clear and convincing evidence that there has been no abuse of confidence,* and that he "acted in good faith, and that the act by which [he] benefitted was the free, voluntary, and independent act of the other party to the relationship."

(Emphasis supplied). See also *Wimmer v. Wimmer,* 287 Md. 663, 669, 414 A.2d 1254 (1980); *Wenger, Admx. v. Rosinsky,* 232 Md. 43, 49, 192 A.2d 82 (1963); *Mullan v. Mullan,* 222 Md. 503, 506, 161 A.2d 693 (1960).

In *Treffinger v. Sterling,* 269 Md. 356, 361, 305 A.2d 829 (1973), the Court of Appeals listed some of the factors that should be considered in deciding whether a confidential relationship exists between a parent and an adult child.

*"Among the factors to be examined in determining whether this relationship has come into being are the parent's advanced age, his physical debility,* his mental feebleness, *and his dependence on his child.* None of these factors is necessarily conclusive and *each should be given that weight which is warranted by the circumstances then present.* Normally it is the minor child who relies heavily upon his parent for care and protection or for guidance in business affairs so that a confidential relationship exists between them with the duties running from the adult to the minor. *It is only when, as a result of debility or feebleness, a parent becomes dependent on his child for aid and counsel, that a confidential relationship is re-established but with* the duties reversed in the latter case and with the *burden of establishing the fairness of the transaction cast upon the child."*

(Emphasis supplied). See also *Frain v. Perry,* 92 Md.App. 605, 611, 609 A.2d 379 (1992) ("The issue of confidential/dependent relationship normally arises in a parent-child situa-

tion.... [A]ge, debility and dependence are important considerations.").

The appellant views much too narrowly the implications of a finding of a confidential relationship. Even granting her factual predicate as to her Father's wishes as of October 26, 2004, that would still have represented a dramatic change from his wishes as expressed in the Codicil of September 16, 2004. It is that change itself that may have been the forbidden fruit of the confidential relationship. The rest is only detail. The appellant protests that her conveyance of the real property to herself "was in accordance with the final wishes" of her Father. She ignores the antecedent implication that her Father's "final wishes" may themselves have been the forbidden fruit of the confidential relationship.

The appellant protests that the conveyance of the property was simply the logical alternative when the Father's effort to procure an equity loan failed. Again, she ignores the antecedent implication that the desire to obtain the equity loan in order to make a gift to her may itself have been the forbidden fruit of the confidential relationship. A lawyer's advice as to how best to implement the Father's wishes does not necessarily abrogate the presumptively improper provenance of those wishes.

The finding of Judge Dwyer that there was a confidential relationship is unassailable. That relationship created, as a matter of law, the presumption that any largesse exercised by the Father toward the appellant—be it by deed of property or by gift from an equity loan—was improperly induced by the relationship, whatever the modality of the transfer might turn out to be. The burden was cast upon the appellant to rebut that invalidating presumption. Judge Dwyer found that "in no manner has she met that burden." Judge Dwyer was simply not persuaded, and there was evidence to support that non-persuasion. That there might also have been some evidence in the case pointing in the other direction is beside the point. It was clearly a question of fact for the fact finder.

Judge Dwyer's conclusion in that regard cannot, therefore, be said to have been clearly erroneous.

### Power of Attorney Analysis

■ Judge Dwyer's ruling with respect to the confidential relationship is, in and of itself, dispositive of the appeal. His very thorough findings and rulings with respect to the appellant's abuse of the Power of Attorney, however, furnishes an independent and alternative basis for affirming the court's verdict. As a sound alternative basis for our affirming the court below, it is deserving of our consideration.

On May 26, 2004, the Father executed a broad 21–page Power of Attorney to the appellant, appointing her as his Attorney–in–Fact. Of pertinence to the issue before us—the gift by deed of his residence to her—is the last paragraph of the preamble.

> *All powers* granted in this Power *are granted with the understanding that they will be used for m y benefit and on my behalf and will be exercised* only *in a fiduciary capacity.*

(Emphasis supplied).

In examining the authority granted to the appellant by the Power of Attorney, Judge Dwyer first recited that provision in the preamble that all powers "are granted with the understanding that they will be used for my benefit and on my behalf." He then looked to Article One, dealing with general powers, and focused in on what precisely could be done with respect to real property. Subsection 1.1(b) listed the authorized transactions.

> (b) Sell, exchange, convey with or without covenants, quitclaim, release, surrender, mortgage, encumber, partition, consent to partitioning, subdivide, apply for zoning, or other governmental permits, plat or consent to platting, develop, grant options concerning, lease or sublet, or otherwise dispose of any estate or interest in real property or a right incident to real property, including but limited to remainder and life estate interests.

That express grant of authority does not convey the power to make a gift of the real property.

Judge Dwyer ruled that the making of the deed in this case was not authorized by that general power.

[T]he power of attorney begins with all powers are granted with the understanding that they will be used for my benefit, on my behalf, and will be only exercised in a fiduciary capacity. *The power to convey this real estate I find is not included in 1–1 the real property transactions because that gives the attorney in fact all the powers listed in this … to transfer, sell, exchange, convey. Nowhere does it give the power to gift real property.*

(Emphasis supplied).

The decision of the Court of Appeals in *King v. Bankerd,* 303 Md. 98, 492 A.2d 608 (1985), stands for the principle that the general power to "convey, grant, bargain and/or sell" does not include the power to make a gift of the real property. The Court of Appeals, 303 Md. at 102, 492 A.2d 608, posed the precise question then before it.

*The single issue* presented in this case is *whether a power of attorney authorizing the agent to "convey, grant, bargain and/or sell"* the principal's property *authorizes the agent to make a gratuitous transfer of that property.*

(Emphasis supplied).

The plaintiff, and theretofore absentee landowner, in that case charged the defendant, who had been given a broad power of attorney by the landowner, with a breach of trust and breach of fiduciary duty for having made a gratuitous gift of the property to the absentee's wife, believing that the missing husband might be dead. Judge Cole's analysis for the Court of Appeals began with the general proposition that powers under a Power of Attorney are strictly constructed.

As Chief Judge Murphy observed for this Court in *Klein v. Weiss,* 284 Md. 36, 61, 395 A.2d 126, 140 (1978), one "well settled" rule is that *powers of attorney are "strictly con-strued as a general rule and [are] held to grant only those powers which are clearly delineated[.]"*

303 Md. at 105, 492 A.2d 608 (emphasis supplied). Judge Cole's opinion continued:

Another accepted rule of construction is to discount or disregard, as meaningless verbiage, all-embracing expressions found in powers of attorney. Restatement, *supra,* § 34 comment h. *Because powers of attorney are ordinarily very carefully drafted and scrutinized, courts give the terms used a technical rather than a popular meaning.*

303 Md. at 106, 492 A.2d 608 (emphasis supplied).

 The Court of Appeals pointed out that the general power to convey real property does not, absent a special grant of authority in that regard, include the right to make a gift of the property.

*[A] general power of attorney authorizing an agent to sell and convey property,* although it authorizes him to sell for such price and on such terms as to him shall seem proper, *implies a sale for the principal's benefit. Such a power of attorney,* however, *does not authorize the agent to make a gift of the property,* or to convey or transfer it without a present consideration inuring to the principal.

. . . *[W]e conclude that an agent holding a broad power of attorney lacks the power to make a gift of the principal's property,* unless that power (1) is expressly conferred, (2) arises as a necessary implication from the conferred powers, or (3) is clearly intended by the parties, as evidenced by the surrounding facts and circumstances.

303 Md. at 106–07, 492 A.2d 608 (emphasis supplied).

 The opinion finally pointed out how making a gift of real property pursuant to a Power of Attorney is not, as a general rule, compatible with acting in the best interests of the person who granted the Power of Attorney.

[T]he power to make a gift of the principal's property is a power that is potentially hazardous to the principal's interests. Consequently, this power will not be lightly inferred from broad, all-encompassing grants of power to the agent. Accordingly, *"the agent must be circumspect with regard to the powers created—or the lack of them."*

Second, the main duty of an agent is loyalty to the interest of his principal. Restatement, *supra*, § 39 ("Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal."); *id.* § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."). Thus, *in exercising granted powers under a power of attorney, the attorney in fact is bound to act for the benefit of his principal and must avoid where possible that which is detrimental unless expressly authorized.*

303 Md. at 108, 492 A.2d 608 (emphasis supplied).

Judge Dwyer then turned his attention to § 1.13 of the Power of Attorney, which dealt specifically with "Gifts." The broad authority to make gifts included gifts of cash, of personal property, and of real property. Section 1.13 provides:

**Gifts.** *I give my attorney-in-fact the power to make gifts,* grants, or other transfers without consideration, *of cash, or other real or personal property* (including but not limited to any property then constitut[ing] or included in any revocable trust established by me), either outright or in trust, including the forgiveness of indebtedness, in accordance with the provisions in this paragraph.

(Emphasis supplied).

Implementing § 1.13 was subsection 1.13(a), which dealt specifically with "Gifts To My Descendants." There was, to be sure, a grant of power; but there were express limitations imposed on its exercise. That subsection enjoined the attorney-in-fact to determine the "reasonableness of any proposed gift" and then spelled out certain factors that should be taken into consideration in determining the reasonableness of any proposed gift.

(a) *Gifts To My Descendants.* Gifts may be made to any one or more of my children and/or other descendants (including my attorney-in-fact, if my attorney-in-fact is one of such persons), either outright or in trust, in such amounts and *upon such terms and conditions as my attorney-in-*

*fact,* in my attorney-in-fact's sole judgment, *may deem to be reasonable. In determining the reasonableness of any proposed gift, my attorney-in-fact shall take into consideration the extent and nature of my assets;* the federal transfer taxes that may result from a gift and/or from my death; *the natural objects of my bounty* and the federal estate and/or income taxes to which they may be subjected; and my potential need for long-term care, the costs thereof and the possibility of my qualification for any program of public or private benefits to pay for such costs. The fact that I may not have established a gift giving program or pattern prior to the exercise of this power by my attorney-in-fact shall not be considered a manifestation of a purported desire by me not to undertake such a program at a subsequent time.

(Emphasis supplied).

Judge Dwyer found and ultimately ruled that the appellant, in deeding the family home to herself, did not act reasonably within the contemplation of § 1.13(a).

1.13 can or does in certain specific instances give the power to gift real property. But *when you're gifting to a descendant, which she is, then one has to look at the reasonableness of any proposed gift. Because 1–13(a) says in determining the reasonableness of any proposed gift, my attorney in fact,* Ms. Figgins, shall take into consideration the extent and nature of my assets, the federal transfer taxes, *the natural objects of my bounty* and the federal, state, and, and/or income taxes and other matters including potential for long-term care.... *Obviously she did not take any of that into consideration because she didn't even know they existed at the time of the transfer because she hadn't read the power of attorney.* If she had then she would have realized that ... *she was removing 85 percent of the assets of the estate and that is certainly to the detriment of the other natural objects of the bounty,* the other three children.

(Emphasis supplied).

Indeed, the appellant not only denied ever having read the Power of Attorney but expressly disclaimed having acted

pursuant to the Power of Attorney. She insists, in her appellate brief, that she never exercised any discretion of her own but only acted mechanically in signing the deed for her Father.

> *Diane Figgins's act of signing this Deed was clearly ministerial only necessitated by the fact that Mr. Cochrane had* suddenly become ill and *was unable to sign it himself.* Thus, *Diane Figgins did not exercise any judgment or make any decision to convey the property to herself but merely signed* a deed prepared by Mr. Cochrane's lawyer *at Mr. Cochrane's request since Mr. Cochrane could not sign it himself.* So while here most likely was a confidential relationship, *the actions taken* by Diane Figgins *did not arise out of that confidential relationship but rather arose out of Mr. Cochrane's relationship with his lawyer,* Mr. Borison, *who asked Diane Figgins to sign the deed since his client Mr. Cochrane could not do so himself.* Thus, it would seem incongruous to suggest that Diane Figgins as the trusted party was taking advantage of her position to her own advantage. *Diane Figgins took advantage of nothing other than the invitation to sign the deed since Mr. Cochrane could not do so himself.*

(Emphasis supplied).

That argument, in effect, asserts that she could have done just as she did even if no Power of Attorney had ever been created. More realistically, the appellant seems to be seeking the benefits of the Power of Attorney without incurring any of its obligations.

With some evidence pointing in both directions, Judge Dwyer found, as a matter of fact, that the Father's testamentary intent was precisely as he had expressed it in his Codicil of September 16, 2004.

> *[W]e need also to look at the intent of Mr. Cochrane....* *[T]hat is very expressly stated in the last, the codicil of the last will and testament exercised on September 16th, 2004,* less than two months before his death, which gives to, first, Mrs. Figgins the value of the improvements of the residence

have to be taken off of the top and it was interesting that the term residence was used rather than real property. Because it was the real property, arguably at the time of his death he'd have no real property. He had a residence, but he had no real property because of the deed. But they distinguish real property from residence because the one paragraph says residence and that was, Ms. Figgins even testified he died at home and from the residence *you have to take off the value of the improvements,* which I didn't realize were in evidence but certainly are in evidence, to be *$46,000, and then the exclusive right to remain in that real property,* now we use the term real property as opposed to residence, *is given to Ms. Figgins.* Any real property owned by me at the time of my death. *She has the right to remain there for three years and then she also has the right to purchase. . . . So she gets three years and then 120 days to purchase. That certainly shows the intent of Mr. Cochrane.*

(Emphasis supplied).

With the evidence arguably permitting inferences in both directions, Judge Dwyer rejected the inference that the appellant's conveyancing of the real property to herself was in compliance with her Father's wishes or intent.

I also look at the fact that *if this is what Mr. Cochrane actually wanted to do* when he went in to see Mr. Borison *on October 26th, all he had to do was* rather than doing a new deed, which Mr. Borison couldn't do because he didn't have the old deed there, was *just do a new, just strike that codicil and give or bequeath to Mrs. Figgins the real property.*

(Emphasis supplied).

Judge Dwyer concluded that the conveyancing of the property was not a reasonable exercise under the Power of Attorney.

I find that first, the exercise of the power of attorney is not in accordance with the provisions of the power of attorney because *under the gift provision, which is the only provi-*

*sion which authorizes a transfer of real property* for out, *for a gift without consideration, that the attorney in fact had to take into consideration the nature and extent of [the] assets,* federal taxes, *natural objects of my bounty, and things of that nature. None of that was done. If it had been done it would not have been a reasonable transaction. We have to look at the reasonableness of the proposed gift,* taking into consideration all of that. *That certainly was not done and there is no reasonableness to this gift.*

(Emphasis supplied).

When asked by the Personal Representative why she had conveyed the property to herself, the appellant's reply, "Because I deserved it," was an evidentiary two-edged sword that could have been taken in different ways. It could, of course, have been evidence that the appellant believed that the deed to herself to be reasonable. It could also, on the other hand, have been evidence that the appellant was not acting for the benefit of and on behalf of her Father but rather was acting for the benefit of herself. It is precisely to handle such evidentiary two-edged swords that we have fact finders, and in this case the fact finder was Judge Dwyer. For our part, we defer to the fact-finding done by Judge Dwyer, as long as it has some support in the record. When he made no particularized fact-finding, we accept as true that version of the evidence most favorable to the prevailing party, in this case the Personal Representative.

Judge Dwyer's ultimate conclusion was a merger of both the Power of Attorney analysis and the confidential relationship analysis.

*I find that it's not authorized under the power of attorney because it didn't comply with 1.13 of the power of attorney* and, *because of the confidential relationship, the burden is upon her to show validity of a no consideration transfer* and that was by clear and convincing evidence. *She hasn't met that.* The Plaintiff prevails and a *constructive trust is granted.*

(Emphasis supplied).

Under either analysis or under both, we see no error.

## Rule 5–803(b)(3): The State of Mind Exception
## to the Rule Against Hearsay

The appellant finally makes a major issue of one evidentiary ruling made by Judge Dwyer. In view of our affirmation of Judge Dwyer's verdict on the basis of both his confidential relationship analysis and his Power of Attorney analysis, the evidentiary contention is almost certainly moot. It nonetheless raises intriguing considerations that we deem worthy of comment. See *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706 (1892), for an instance of the Supreme Court's succumbing to an indistinguishable temptation.

In testifying about the October 26, 2004, meeting between himself and the Father, the Father's attorney started to recount an out-of-court declaration made by the Father with respect to the Father's intentions.

Q. All right. What occurred after, you met Mr. Cochrane at this point?

A. Basically, he *told me* that the refinancing wasn't going to happen, and *that he would like to transfer* ...

Mr. W. Green: Objection

(Emphasis supplied).

Any discussion of the subject by counsel preceding that ruling was essentially non-existent. The court quickly concluded that, because the proffered declaration was being offered for the truth of the matter asserted, it was hearsay by definition. The appellant never suggested that the declaration might nonetheless be admissible under some exception to the rule against hearsay. The entire exchange was very cursory.

THE COURT: All right now, why isn't this going to be hearsay?

. . . .

Mr. Winters: The proffer is that Mr. Borison will say that Mr. Cochrane indicated the loan didn't go through and that he wanted to transfer the property instead directly to his daughter.

. . . .

THE COURT: But you are offering it for the truth of the fact that he wanted to give the property to his daughter?

Mr. Winters: I'm offering it to establish his intent to give a gift to his daughter, yes . . .

Mr. W. Green: Continue to object on the basis of hearsay. It does not fall under one of these established exceptions . . .

. . . .

THE COURT: But objection's sustained.

The appellant now contends that the proffered declaration was admissible pursuant to Maryland Rule 5–803(b)(3), a statement of a then existing mental or emotional condition. Rule 5–803(b)(3), as we shall discuss, is one of the more esoteric of the hearsay exceptions. We have serious doubt that a trial judge should be deemed guilty of error for not having delved *sua sponte* into its mysteries when counsel never argued that the objection called for anything beyond a determination of whether a declaration was or was not hearsay.

If the declaration in question was hearsay, as indeed it was, Judge Dwyer had no choice but to exclude it unless the proponent of the hearsay satisfied him that the statement fell within one of the exceptions to the rule against hearsay. Absent such a showing, Judge Dwyer was required, as a matter of law, to rule the hearsay inadmissible. Judge Raker stated, for the Court of Appeals in *Bernadyn v. State,* 390 Md. 1, 7–8, 887 A.2d 602 (2005):

We review rulings on the admissibility of evidence ordinarily on an abuse of discretion standard. *See Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231, 237 (1998). Review of the admissibility of evidence which is hearsay is different. Hearsay, under our rules, *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is "permitted by applicable constitutional provisions or statutes." Md. Rule 5–802. Thus, a circuit court has no discretion to admit hearsay in

the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo.*

Neither the state of mind exception to the hearsay rule nor any other exception was urged upon Judge Dwyer as he made his ruling. The appellant's brief acknowledges that Judge Dwyer was never called upon to probe the intricacies of Rule 5–803(b)(3).

> *The trial court was never offered a legal analysis of the law with respect to* the *admissibility* of Mr. Cochrane's statements to Mr. Borison which clearly was the best evidence as to Mr. Cochrane's true intent.

(Emphasis supplied). The brief went on to reconfirm that the judge was never alerted to the issue.

> *Maryland Rule 5–803 was never discussed, analyzed or otherwise considered,* apparently, in the trial court's decision to exclude Mr. Borison's proffered state of mind testimony.

(Emphasis supplied).

## A False Trail

In urging her contention that Judge Dwyer erroneously refused to admit the Father's hearsay declaration of October 26, 2004, the appellant completely misses the point. She spends at least 50% of her time vouching for the impeccable reputation and undisputed credibility of Scott Borison, Esq., the attorney who witnessed the declaration. The reputation and credibility of the witness to the declaration, however, had absolutely nothing to do with the adverse ruling on its admissibility into evidence.

What was in question was not what Mr. Borison heard and repeated. The fact that the declaration was actually made and accurately recounted was not in doubt. What is invariably in question in ruling on the admissibility of hearsay is 1) the trustworthiness of the out-of-court declaration itself, 2) its materiality, and 3) its relevance to prove some particular issue in the case. The testimonial veracity of the witness to the

hearsay has nothing to do with resolving those issues. In trying to turn this ruling into a ruling about Scott Borison, the appellant is simply setting up a straw man and then knocking it down.

### The Tripartite Utility Of The State of Mind Exception

We choose to discuss this particular hearsay exception, nonetheless, although we would find no fault in Judge Dwyer for not having done so. We, after all, have been alerted to the existence of the exception, even if he had not been.

The state of mind exception (or bundle of closely related exceptions) has not been fully explored by the case law. As the scant handful of cases dealing with it reveal, the exception, when fully parsed out, may actually be an omnibus provision, arguably covering three different temporal focuses. Those three focuses embrace the three tenses: past, present, and future.

In one very limited context, the declarant's state of mind may look backward to cast interpretive light on an otherwise ambiguous testamentary provision. The declarant's then present state of mind may on other occasions bear directly on what is an issue of ultimate fact in a case. It is looking right at an issue in the case in the present tense. On yet other occasions the declarant's state of mind may be forward-looking, as it helps to prove some future happening or to resolve some future ambiguity.

In Lynn McLain, *Maryland Evidence* (2d ed.2001), § 803(3).1, "Statements of then existing mental or emotional condition," Professor McLain, in three separate subsections, recognizes this tripartite utility of the exception depending on tense. Subsection b., 202–03, deals with a "Statement Offered to Show Simply that the Declarant Had the State of Mind He or She Asserted," as it analyzes "an assertion of the declarant's present state of mind or emotion in order to show that the declarant had that state of mind *when he or she spoke.*" (Emphasis supplied). Subsection c., 203–07, analyzes " 'Forward Looking' Statements, Offered to Prove What Happened

After an Intent was Stated." Subsection d., 207–09, turns its attention to " 'Backward Looking' Statements, Offered to Prove What Happened Before the Statement."

A schematic look at Rule 5–803(b)(3) may be helpful. For all three time frames—present looking, forward looking, and backward looking—the subject of the rule is the same:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove ...

The three temporal predicates are then set out:

... the declarant's *then existing* condition [Present Looking]

... or the declarant's *future action* [Forward Looking]

... *but not* including *a statement of memory or belief* to prove the fact remembered or believed *unless* it relates to the execution, revocation, identification, or terms of declarant's will. [Backward Looking].

(Emphasis supplied).

### The State of Mind Looking Backward
### In a Testamentary Context

Generally speaking, the statement of the declarant's state of mind, to be admissible, must not be "backward looking" unless it relates to the declarant's testamentary intent. By its express terms, Rule 5–803(b)(3), after cataloging what will not be excluded by the hearsay rule, goes on to note the exemption from that catalog of approvals of backward looking declarations and the exemption from the exception for testamentary interpretations.

Of the roughly half dozen Maryland cases dealing with the state of mind exception, no less than three have been "backward looking." In *Ebert v. Ritchey*, 54 Md.App. 388, 458 A.2d 891 (1983), Charles Ebert, a childless widower, in 1976 placed the name of his youngest brother, Anthony, along with his own, on five joint bank accounts. When Charles died in 1978, a controversy arose as to whether Anthony was entitled to the

money in the five joint accounts or whether a constructive trust should be imposed for the benefit of three other siblings of Anthony and Charles.

Ultimately three witnesses to five conversations with Charles between May and October of 1977 were permitted to testify as to his intent and purpose in putting Anthony on the joint accounts. Charles had told the witnesses that he had "put Anthony in charge of things" so that he "could pay all the bills and straighten out all the problems that arise" and then the siblings "could take and divide up the estate." 54 Md.App. at 391, 458 A.2d 891. Largely on the basis of that testimony as to Charles's state of mind as he looked back on action he had taken a year earlier, a constructive trust was imposed.

In appealing that decision, one of Anthony's contentions was that the chancellor had erred by "receiving inadmissible evidence to prove a trust." *Id.* In affirming that part of the chancellor's decision, Chief Judge Gilbert held:

> We think that *the testimony* of the three witnesses *as to the content of Charles's conversations* with them relative to his intent to have Anthony marshal the assets of the estate, pay the outstanding final debts, and then divide the net proceeds equally among the four siblings *was admissible under the state of mind, or true intention exception to the Hearsay Rule.* Thus, we hold that the chancellor did not err in permitting such testimony.

54 Md.App. at 398, 458 A.2d 891 (emphasis supplied).

In *DAR v. Goodman,* 128 Md.App. 232, 736 A.2d 1205 (1999), the testatrix wrote a Last Will and Testament on November 2, 1994. She left 80% of the residue of her estate to Gallaudet University and 20% to the Daughters of the American Revolution for the specific purpose of using it for a Nursing Home for the use of destitute DAR members. A month later, the testatrix learned that the DAR did not maintain a nursing home facility. It was thus impossible to follow the express terms of the original bequest. When the testatrix died in 1995, the issue became that of whether the

20% bequest was a general charitable bequest to the DAR or whether the entire residuary estate should go to Gallaudet.

After learning that the DAR did not maintain a nursing home, the testatrix had a conversation with her attorney. She stated that "because the nursing home did not exist, she wished to leave all of her residuary estate to Gallaudet." The attorney was directed to prepare a revised Will, but the testatrix died before it could be executed. The question before the court was whether the testatrix, in making the original bequest to the DAR, had or had not "manifested a general charitable intent." 128 Md.App. at 237, 736 A.2d 1205. In resolving that ambiguity, the court permitted the lawyer to testify as to the testatrix's statement to him about her wishes, under Maryland Rule 5–803(b)(3). In affirming that evidentiary ruling by the trial court, Judge Sonner held:

> We hold that the testimony of Mrs. Swindells's attorney as to the testator's intent to leave the entirety of her residuary estate to Gallaudet is admissible under the state of mind exception to the hearsay rule. The statements at issue do not indicate that the testator intended to perform a future act; rather, the testator simply expressed what her testamentary intention would be if the bequest to the DAR nursing home lapsed. *The decedent's post-executory, out-of-court statements to her attorney represent backward-looking declarations relating to the terms of the declarant's will. As such, they fall squarely within the language of Md. Rule 5–803(b)(3)* as statements of memory or belief concerning the execution, revocation, identification, or terms of a declarant's will. The trial court properly found that the disputed evidence was admissible under the state of mind exception to the hearsay rule.

128 Md.App. at 239, 736 A.2d 1205 (emphasis supplied). See also *Hoppe v. Byers,* 60 Md. 381, 393 (1883); *Mason v. Poulson,* 40 Md. 355, 364–65 (1874).

The third application of Rule 5–803(b)(3) to validate a declaration of a state of mind to shed interpretive light "looking backward" was *YIVO Institute for Jewish Research v. Zaleski,* 386 Md. 654, 874 A.2d 411 (2005), as it affirmed the

earlier decision by this Court in *YIVO v. Zaleski*, 156 Md.App. 527, 847 A.2d 510 (2004). On October 25, 1993, the testator executed his Last Will and Testament. He had earlier made a pledge by letter to Yivo indicating that he would, in his Will, make a gift of $100,000 for the express purpose of setting up an endowment in order to make an annual award to authors writing on a certain subject. In his Will, the testator bequeathed to Yivo certain shares of stock of an estimated value of $100,000 at the time the Will was executed.

Subsequent to making his Will in 1993 and prior to his death on July 12, 2000, the testator made a series of *inter vivos* gifts of stock to Yivo of a total value of $99,997.69. He then supplemented those gifts by a further gift of $2.31, in order to bring the total to an even $100,000. All of the gifts were made between November 28, 1995, and February 7, 1996. After his death in 2000, the question arose as to whether the $100,000 bequest to Yivo had been adeemed by satisfaction. The issue was whether the testator had intended the *inter vivos* gifts to adeem the earlier bequest.

In finding that the bequest had been adeemed by satisfaction, the trial judge admitted the testimony of a Dr. Ploss as to statements made to her by the testator on several occasions in 1998. The declaration by the testator was:

> [F]rom time to time he said, "You know, maybe I should change my will just in case the YIVO Institute will come and ask once more for the money when I already have given it to them," and then he always answered his own question, "No. They are much too decent to do such [a] thing. No."
>
> * * *
>
> He was absolutely sure they will not come a second time and ask for the money when I have already given it to them, that is something that sticks in my mind, "I have already given them the money." We find that the court did not err in allowing the testimony.

386 Md. at 673, 874 A.2d 411.

The state of mind of the declarant in 1998 looked backward to the ademptive purpose of the *inter vivo* gifts in 1996, if not

to his Will itself in 1993. Judge Greene's opinion for the Court of Appeals examined Rule 5–803(b)(3), and held that two years was not too long a period to permit such a "looking backward."

YIVO argues that the evidence should not have been admitted because the statements made by Dr. Karski to Dr. Ploss were made two years after the lifetime gifts were given to YIVO and, thus, were too far removed to be relevant. As the Kansas court recognized in *Trustees of Baker University,* however, the *"better reasoned authorities allow evidence of declarations made long after the inter vivos payment admissible for the purpose of showing a testator's intention in making a gift even if made subsequent to the gift,* the matter of time merely going to the weight to be accorded such evidence rather than its admissibility." *Trustees of Baker University,* 564 P.2d at 481 (citations omitted). Furthermore, YIVO offered no case law to justify its position on this point. The Orphans' Court found that the testimony was relevant and admissible. As extrinsic evidence is admissible for purposes of showing the testator's intent in ademption cases, we affirm the decision to admit Dr. Ploss's testimony.

386 Md. at 674, 874 A.2d 411 (emphasis supplied).

Let it be carefully noted that in each one of these "backward looking" cases there is a direct identity between the person making the declaration about his state of mind and the person who earlier took the action calling for interpretation.

In the case now before us, of course, the proffered declaration made by the Father to the attorney was *not* offered for any "backward looking" purpose and had no bearing on any earlier testamentary action taken by the Father.

### State of Mind As a Present Fact in Ultimate Issue

The present tense utility of Rule 5–803(b)(3) occurs when the declarant's existing state of mind is a fact in ultimate issue. This is not a case in which the state of mind is offered to help resolve some earlier or later ambiguity or is offered to

help prove some future event. It is rather the case in which the state of mind itself, as of the very moment of its declaration, is a direct issue calling for resolution. The then present state of mind, "I think I'm a goner," for instance, would have immediate materiality in qualifying a dying declaration.

The most helpful explanation of this use of the exception is found in John W. Strong, *McCormick on Evidence* (4th ed.1992), § 274, "Statements of Physical or Mental Condition: (b) Statement of Present Mental or Emotional State to Show a State of Mind or Emotion in Issue," 227–28.

> *The substantive law often makes legal rights and liabilities hinge upon the existence of a particular state of mind* or feeling. Thus, such matters as the intent to steal or kill, or the intent to have a certain paper take effect as a deed or will, or the maintenance or transfer of the affections of a spouse may come into issue in litigation. When this is so, *the mental or emotional state of the person becomes an ultimate object of search. It is* not *introduced* as evidence from which the person's earlier or later conduct may be inferred but *as an operative fact upon which a cause of action or defense depends.* While a state of mind may be proved by the person's actions, the statements of the person are often a primary source of evidence.

(Emphasis supplied).

*McCormick on Evidence*, 230–31, gives examples of when the declarant's present state of mind is admissible evidence of a state of mind in issue.

> Common examples of statements used to prove mental state at the time of the statement include: *statements* of intent to make a certain place the declarant's home offered *to establish domicile, statements* expressive of mental suffering *to prove that element of damages,* statements by customers regarding anger to prove loss of good will, *statements* of patients *regarding lack of knowledge of risk of taking medication in malpractice, statements* of willingness to allow one to use the declarant's automobile offered *to prove that the car was used with the owner's consent,*

statements accompanying a transfer of property showing intent, or lack of intent, to defraud creditors, *statements of ill will to show malice* or the required state of mind in criminal cases, and statements showing fear.

(Emphasis supplied).

The case most closely representing this direct applicability of Rule 5–803(b)(3) in the present tense is the decision of this Court in *Santoni v. Moodie*, 53 Md.App. 129, 452 A.2d 1223 (1982). The declaration of a mental state made by the plaintiff's decedent to the plaintiff in that case showed that the declarant was then unaware of any risk in continuing to take a certain medication. The fact in issue was whether the declarant was contributorily negligent in taking the medication that ultimately led to his death. His awareness or unawareness of the risk was dispositive of the contributory negligence defense. We stated the issue, 53 Md.App. at 140, 452 A.2d 1223:

> It is, furthermore, clear that *the key issue on the subject of contributory negligence is the foreseeability of harm* on the part of Mario Santoni. *If he was fully aware of the risks* involved in the treatment he was taking and persisted in the treatment notwithstanding that awareness, *he may well have been contributorily negligent. If,* on the other hand, *Mr. Santoni was unaware of the risks* he was being subjected to, *then he was not contributorily negligent.* The pivotal issue is that of what Mario Santoni knew on the subject of risk. *What had to be probed* in this regard *was,* by definition, *Mario Santoni's state of mind.*

(Emphasis supplied).

In *Santoni,* this Court was poignantly aware that its analysis was teetering right on top of several troubling borderlines. The state of mind of being unaware of a risk was at the same time both "present looking" and "forward looking," for the assessment of contributory negligence may extend over a considerable period of time. If nothing else, that dual utility of the hearsay exception did complicate the analysis. We ourselves were aware that we were standing on an unstable analytic fault line.

Indeed, *the only point that troubles the legal scholars is* not the question of whether a declaration bearing on a material state of mind may come in, but rather the question of *under what theory the declaration shall come in.* To the extent to which the declarations are simply the circumstantial predicate from which the state of mind may be inferred, they are deemed to be non-hearsay and do not even involve the hearsay rule. *To the extent to which a declaration goes directly to the state of mind in issue, it is hearsay but is admissible hearsay* under the "state of mental condition" exception to the hearsay rule. *This is the seam of the zone defense where two different theories come together.*

53 Md.App. at 149–50, 452 A.2d 1223 (emphasis supplied).

For philosophical hairsplitters, moreover, the unawareness of risk is not *ipso facto* the absence of contributory negligence. It is still perhaps half a step, or a quarter of a step, short of being the actual issue although it is virtually certain proof of the issue. That nuance of difference again complicates the analysis.

The more unsettling fault line is that between a hearsay exception and nonhearsay. *McCormick* puts its finger on the difficulty of analysis right at the point where the two evidentiary phenomena come together.

In many instances, statements used for this purpose are not assertive of the declarant's present state of mind and are therefore not hearsay. *Courts,* however, *have tended to lump together statements asserting the declarant's state of mind, hence arguably hearsay, with those tending to prove the state of mind circumstantially, arguably nonhearsay,* applying a general exception to the hearsay rule and ignoring the possibility that many of these statements could be treated simply as nonhearsay.

*Id.* at 228, 452 A.2d 1223 (emphasis supplied).

Analysis in such cases sometimes must be undertaken right at the electrically crackling point of metamorphosis where nonhearsay and admissible hearsay transmute back and forth into each other. It is akin to watching matter change into

energy and vice versa. It is also an academic teaser that sometimes evokes the yearning we expressed in *Gray v. State*, 53 Md.App. 699, 710–11, 456 A.2d 1290 (1983):

> One almost longs nostalgically for the discredited label of "res gestae," notwithstanding its utter repudiation in polite academic circles. Its sin was its elusive ambiguity. Ironically, that ambiguity may also have been its occasional virtue.

It was reassuring when one could blithely slap the convenient label of "res gestae" over an entire border zone, without undue worry as to where the precise border itself might lie.

Once again, let it be carefully noted that there is, in this present-tense application of Rule 5–803(b)(3), a direct identity between the person of the declarant and the person whose state of mind is the issue to be decided. In this case, the state of mind of the Father on October 26, 2004, was not an ultimate issue in the case.

### The State of Mind Forward Looking: *Mutual Insurance Co. v. Hillmon*

Although one could not tell it from the paucity of Maryland case law on the subject, the most widespread general use of the state of mind exception is when it is forward looking, either in its predictive or its interpretive capacity.

Once again, there is a nagging analytic problem. The declaration, "I intend to go off into the hills," is offered initially for the truth of the thing asserted, to wit, that the declarant intended to go off into the hills at the time he made the statement. That, of course, is a straight hearsay problem. The intent to go off into the hills, however, may then become circumstantial evidence that it is more likely that the declarant subsequently did, indeed, go off into the hills than would have been the case if he had never expressed such an intention. That, however, is a nonhearsay problem, a problem in the relevant probity of circumstantial evidence. The assertion of A is first offered to prove A, which is then used to help prove

**36**

B. Inevitably, there is the tendency to blend two analyses into a single composite, that of the state of mind exception.

This exception is the true child of one of the great classics in the literature of evidence, the landmark case of *Mutual Insurance Co. v. Hillmon, supra,* decided by the Supreme Court in 1892. The plaintiff in *Hillmon* took out, between November 30, 1878 and March 4, 1879, multiple insurance policies on the life of her husband, John W. Hillmon, and then attempted to collect on them, claiming that her husband had been killed in Crooked Creek, Colorado, on March 17, 1879. A body was, indeed, found in Crooked Creek on the night of March 18, 1879, but it could not be identified with any certainty. The insurance companies resisted payment, alleging that Hillmon was alive and in hiding and that Mrs. Hillmon's claim was a fraud. They alleged that the body found in Crooked Creek was actually that of Frederick August Walters.

The problem for the insurance companies was to prove that Walters had actually been in Crooked Creek at the pertinent time and that he had been there with Hillmon. To that end, the insurance companies offered evidence of two letters written by Walters from Wichita, Kansas, one to his fiancé in Iowa dated March 2 and the other to his sister and sent on March 2 or 3. The letters declared this intention of going off into southern Kansas, Colorado, and the Indian Territory (Oklahoma) with a man named Hillmon. Walters, who had theretofore been a faithful correspondent, was never heard from again.[1]

---

1. For full accounts of the *Hillmon* case, see Murphy, *Maryland Evidence Handbook,* (3d ed.1999) 308–10; McLain, *Maryland Evidence,* 204–05; *McCormick on Evidence,* 235–38. And see McFarland, "Dead Men Tell Tales: Thirty Times Three Years After Hillmon," 30 *Vill. L.Rev.* 1 (1985); Payne, "The Hillmon Case–An Old Problem Revisited," 41 *Va. L.Rev.* 1011 (1955); Hinton, "States of Mind and the Hearsay Rule," 1 *U. Chi. L.Rev.* 394 (1934); Hutchins & Slesinger, "Some Observations on the Law of Evidence—State of Mind to Prove an Act," 38 *Yale L.J.* 283 (1929); Maguire, "The Hillmon Case–Thirty–Three Years After," 38 *Harv. L.Rev.* 709 (1925); Seligman, "An Exception to the Hearsay Rule," 26 *Harv. L.Rev.* 146 (1912).

The letters were not received in evidence. The insurance companies lost the case and appealed. The Supreme Court reversed the trial court on other grounds, but could not resist considering as well the evidentiary problem.

There is, however, one question of evidence so important, so fully argued at the bar, and so likely to arise upon another trial, that it is proper to express an opinion upon it.

145 U.S. at 294, 12 S.Ct. 909.

Justice Gray's opinion for the Supreme Court stated that the letters were competent evidence.

The letters in question were competent not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon than if there had been no proof of such intention.

*Id.* at 295–96, 12 S.Ct. 909.

The 1892 holding of the Supreme Court effectively established the state of mind exception to the rule against hearsay.

Upon principle and authority, therefore, we are of opinion that the two letters were competent evidence of the intention of Walters at the time of writing them, which was a material fact bearing upon the question in controversy; and that for the exclusion of these letters, as well as for the undue restriction of the defendants' challenges, the verdicts must be set aside, and a new trial had.

*Id.* at 299–300, 12 S.Ct. 909.

In Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3d ed.1999), § 803(D), Judge Murphy refers, at 309, to the "Hillmon Doctrine" as having resulted from the case and labels the exception generally as one involving "Statements of Intent." Under the Hillmon Doctrine, the state of mind is very definitely forward looking. Judge Murphy points out, at 310:

> Cases following *Hillmon* have held that *from the declarant's statements* of present intent to meet a third person, *the fact-finder may infer ... the declarant carried out his stated intent* to meet a third person.

(Emphasis supplied).

When offered in this forward looking modality, the pertinent words of Rule 5–803(b)(3) refer to the proof of future action. What is admissible is:

> A statement of the declarant's then existing state of mind ... *offered to prove ... the declarant's future action.*

(Emphasis supplied).

McLain, *Maryland Evidence*, at 203, also refers to this forward-looking utility of a declarant's present state of mind.

> [T]he statement of present state of mind that includes a *statement looking forward into the future* is admissible *to show that the declarant subsequently acted* in accordance with his or her stated intention.

(Emphasis supplied). Let it be noted, as each of these authorities points out, that the statement of intent is admissible to prove the declarant's future actions, not the future actions of someone else.

*McCormick on Evidence*, 234–36, addresses the legitimacy of using a statement of present intent to help prove that the declarant subsequently consummated that intent. It also acknowledges the provenance of the evidentiary principle in the *Hillmon* case.

> Despite the failure until fairly recently to recognize the potential value of statements of state of mind to prove subsequent conduct, it is now clear that *out-of-court statements that tend to prove a plan, design, or intention of the declarant are admissible,* subject to the usual limitations as to remoteness in time and perhaps apparent sincerity common to all statements of mental state, *to prove that the plan, design, or intention of the declarant was carried out by the declarant.*

The leading case is *Mutual Life Insurance Co. v. Hill-mon* . . . .

While Federal Rule 803(3) does not explicitly address the question of admitting intent for the purpose of proving the doing of the intended act, there can be no doubt that the *Hillmon* rule continues. In fact, the Federal Advisory Committee's Note states, *"The rule of Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed."*

(Emphasis supplied).

The forward-looking utility of the present state of mind is not limited to using the present intent to prove the future occurrence of the intended act. It may also help to resolve a future ambiguity. If, for example, the declarant at some future time makes a transfer of money to another person and it should later be necessary to determine whether that transfer was a loan or a gift, the declarant's present statement of intent in that regard may help to clear up the future ambiguity. *Graves v. Spedden,* 46 Md. 527 (1877). Once again, however, there is the necessary identity of person between the declarant of the state of mind and the future actor.

*Kirkland v. State,* 75 Md.App. 49, 540 A.2d 490 (1988), was a case in which this Court sanctioned such a forward-looking use of the declarant's present state of mind. The defendant was on trial for murder. The following statement, made shortly before the murder, was attributed to him by a witness.

I was going to kill the M.F. if he didn't have my money by a certain time.

Judge Bishop, *id.* at 54, 540 A.2d 490, held for this Court:

The State did not indicate at trial the purpose for which it offered the statement but *it is clear that the statement was admissible . . . as a state of mind exception to the hearsay rule. . . .*

. . . .

. . . Kirkland's declaration indicated an intent to kill Andrew Church, who later died due to gunshot wounds inflict-

ed by Kirkland. *The Hillmon Doctrine allows the trial court to admit Kirkland's statement as circumstantial evidence that he carried out his intention and performed the act.*

(Emphasis supplied). See also *Maryland Paper Products Co. v. Judson,* 215 Md. 577, 590–91, 139 A.2d 219 (1958); *Tittlebaum v. Pennsylvania R.R.,* 167 Md. 397, 401–03, 174 A. 89 (1934); *Baltimore & Ohio R.R. v. State ex rel. Chambers,* 81 Md. 371, 382–83, 32 A. 201 (1895); *Cooke v. Cooke,* 43 Md. 522, 532–33 (1876); *Sobus v. Knisley,* 11 Md.App. 134, 140, 273 A.2d 227 (1971).

In all of the forward-looking uses of a present intent to prove a future act or to interpret a future act, there is the identity of person between the hearsay declarant and the future actor. Although some states permit a declarant's statement of intent to prove not only the declarant's future action pursuant to that intent but the future action of another person as well, Maryland does not. McLain, *Maryland Evidence,* 207, is emphatic in stating that Maryland limitation.

Maryland has ... determined that *a declarant's statements of intention may not be used to prove the subsequent actions of another.* Md. Rule 5–803(b)(3) explicitly states that *the evidence may be admitted to prove "the declarant's future action."*

(Emphasis supplied).

Murphy, *Evidence Handbook,* 312, is equally certain about the limited purpose for which the statement of intent may be used.

*The Rules Committee intended that,* under Md. Rule 5–803(b)(3), *statements of intent would be admissible for the limited purpose of proving the conduct of the declarant only,* and *not the conduct of any person mentioned in the declarant's statement* of intent.

(Emphasis supplied).

In *Johnson v. State,* 38 Md.App. 306, 381 A.2d 303 (1977), a declaration of future intent by a murder defendant was admis-

sible to prove the declarant's future actions pursuant to that intent. As this Court stated, 38 Md.App. at 314, 381 A.2d 303:

> [T]he modern cases and texts leave no room to doubt the statement that the accepted principle today is that evidence of *declarations of a plan, design or intention* presently entertained by the declarant is ... *admissible* when offered *as evidence that the design was carried out by acts or omissions of the declarant.*

(Emphasis supplied). When offered to prove the future actions of a codefendant, mentioned in the declaration, the statement of intent by the declarant

> is not permitted under the plan, design or intention exception to the hearsay rule.

*Id.*

For our present purposes, the dispositive case is *Farah v. Stout,* 112 Md.App. 106, 684 A.2d 471 (1996). John M. Sanderson, Jr., died on February 25, 1993. Elizabeth Farah made a claim on his estate for $100,000. For approximately two and a half years, she had "cared for and performed numerous household chores on a daily basis" for Mr. Sanderson alone, and, before that, for both Mr. Sanderson and his wife. Ms. Farah claimed that she was responsible for "house cleaning, laundry, shopping, meal preparation, and personal hygiene services." Ms. Farah claimed that she undertook those "responsibilities in return for Mr. Sanderson's promise to make a bequest of $100,000" to her. 112 Md.App. at 111, 684 A.2d 471.

When Ms. Farah was asked why she had done all of those things, she attempted to testify as to what Mr. Sanderson had told her about his intent to compensate her. Counsel for the estate objected and the objection was sustained. Three witnesses on her behalf were also precluded from testifying about Mr. Sanderson's statements of intent. The verdict was against Ms. Farah and she appealed to this Court.

A key contention was that the testimony of the three non-party witnesses to Mr. Sanderson's expression of his intent to make a bequest to her of $100,000 was erroneously excluded.

Appellant complains that the circuit court erred in excluding the testimony of three non-party witnesses as to Mr. Sanderson's intention, upon his death, to pay $110,000 to Elizabeth and Ramsay. Undoubtedly, that evidence was offered to prove the truth of an out-of-court statement and therefore constituted hearsay. The issue is whether it is admissible as an exception to the hearsay rule. *Appellant argues that the witnesses' statements fall within three recognized exceptions-state of mind,* admission of predecessor in interest, and declaration against interest.

112 Md.App. at 118, 684 A.2d 471 (emphasis supplied).

Chief Judge Wilner wrote for this Court as we considered and rejected the admissibility of the declaration as to Mr. Sanderson's state of mind pursuant to Rule 5–803(b)(3).

*[A]ppellant argues that the testimony should have been admitted under Md. Rule 5–803(b)(3), commonly referred to as the "state of mind" or "statement of intent" exception* to the hearsay rule. Under this exception, *certain forward-looking statements of intent are admissible to prove that the declarant subsequently took a later action in accordance with his stated intent.* In Ebert, we affirmed the admission of hearsay statements under the state of mind exception to explain why the decedent placed his brother's name on five bank accounts. *In the present case, however, no action is alleged.* Instead, appellant is challenging Mr. Sanderson's *inaction*—his failure to include the Farahs in his will. *Even if Mr. Sanderson intended to make a gift to the Farahs and mentioned that intention to others, the fact of the matter is that ultimately no such bequest was ever made. Because the witnesses' statements were not offered to explain Mr. Sanderson's future conduct, the state of mind exception does not apply.*

112 Md.App. at 119, 684 A.2d 471 (emphasis supplied).

■ In this case, the proffered statement of intent of the Father on October 26, 2004, to deed his real property to the appellant was not itself an ultimate issue in the case. In its forward-looking capacity, the Father's state of mind was never

offered to prove or to interpret any future action by him. He fell into a coma and took no future action. Under Maryland law, his October 26, 2004 state of mind could not be used to prove or to explain the future action of someone else, either the appellant or the lawyer.

The Father's intention on October 26, 2004, is immaterial because, whatever he may have intended to do, he never did it. The Father's intention, moreover, is not admissible to prove what someone else may have done. The declaration is out!

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**